569 S.E.2d 462

Jeffrey L. MARLIN, Sr., et al., Plaintiffs Below, Appellees,

v.

WETZEL COUNTY BOARD OF ED-UCATION, et al., Defendants and Third Party Plaintiffs Below.

Wetzel County Board of Education, Defendant and Third Party Plaintiff Below, Appellant,

v.

Commercial Union Insurance Company and Northern Assurance Company of America, a subsidiary of Commercial Union Insurance Company, Third–Party Defendants Below, Appellees.

No. 30100.

Supreme Court of Appeals of West Virginia.

Submitted March 12, 2002.

Decided June 18, 2002.

Thomas E. Buck, Esq., James M. Hoffman, Esq., Bailey & Wyant, P.L.L.C., Wheeling, for the Appellant.

John J. Polak, Esq., Rose & Atkinson, Charleston, John C. Falls, Esq., Christie, Pabarue, Mortensen & Young, Philadelphia, PA, for the Appellees.

STARCHER, Justice.

In this declaratory judgment action appealed from the Circuit Court of Wetzel County, the parties dispute whether a property owner is an "additional insured" under two liability insurance policies issued to a

general contractor that was hired by the property owner to perform construction work. The property owner seeks the coverage in response to a lawsuit filed against the property owner by employees of various subcontractors of the general contractor, who allege they were exposed to asbestos during the construction work.[1]

The circuit court issued an order on January 5, 2001, declaring that the property owner was not entitled to coverage under the two policies. As set forth below, we reverse the circuit court's order.

## I.

### *Facts & Background*

The appellant is the Wetzel County Board of Education ("Board"). On August 17, 1987, the Board entered into a construction contract with a general contractor, Bill Rich Construction (doing business as American Contractors), to renovate Hundred High School. The contract required, *inter alia,* that Bill Rich Construction indemnify and hold harmless the Board from and against all claims arising from Bill Rich Construction's performance of the contract.[2] Furthermore, the contract required Bill Rich Construction to purchase and maintain a liability insurance policy, which was to include contractual liability insurance covering its indemnification obligations.[3] The contract also required Bill Rich Construction to have the Board named as an "additional insured" on that liability insurance policy.[4] Lastly, the construction contract required Bill Rich Construction to provide the Board with a "certificate of insurance" indicating that the Board had been added to the policy as an additional insured.

1. For details of the lawsuit, *see Marlin v. Bill Rich Construction, Inc.,* 198 W.Va. 635, 482 S.E.2d 620 (1996).

2. Concerning indemnification, the contract stated, in part:

 4.18.1. To the fullest extent permitted by law, the Contractor [Bill Rich Construction] shall indemnify and hold harmless the Owner [Wetzel County Board of Education] ... and their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Work, *provided that any such claim, damage,* loss or expense (1) is attributable to bodily injury, sickness, disease or death ... and (2) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified thereunder....

3. Concerning liability insurance, the contract specified, in part:

 11.1 CONTRACTOR'S LIABILITY INSURANCE
 11.1.1 The Contractor shall purchase and maintain such insurance as will protect him from claims set forth below which may arise out of or result from the Contractor's operations under the Contract, whether such operations be by himself or by any Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any *of them may be liable:* ...
 .2 claims for damages because of bodily injury, occupational sickness or disease, or death of his employees;

 .3 claims for damages because of bodily injury, sickness or disease, or death of any person other than his employees; ...
 11.1.3 The insurance required by Subparagraph 11.1.1 shall include contractual liability insurance applicable to the Contractor's obligations under Paragraph 4.18.

4. An addendum to the general conditions contained in the contract, entitled Supplemental General and Special Conditions, contains the following provision:

 1.6 CONTRACTOR'S AND SUBCONTRACTOR'S INSURANCE
 A. In furtherance of Article 11 of the General Conditions, each contractor furnishing labor and materials ... [shall provide] evidence of the following:
 IMPORTANT! FAILURE TO INCLUDE ANY OF THE FOLLOWING REQUIREMENTS MAY CAUSE DELAY IN EXECUTION OF CONTRACTS, ISSUANCE OF NOTICE TO PROCEED, OR REJECTION OF CONTRACT BY OWNER.
 The ... Owner shall be ADDITIONALLY INSURED on the contractor's policy. The Contractor shall be the NAMED INSURED.
 ...
 7. Certificate of Insurance
 a. The Certificate of Insurance shall be provided by the Contractor to the Owner ...
 b. The Certificate of Insurance shall contain a provision that coverage afforded will not be cancelled until at least sixty (60) days prior written notice has been given to the Owner ...
 c. The Owner shall be the Certificate Holder.
 d. The Certificate shall be prepared on "Acord" Form 25 (2/84) or an equivalent form.
 e. The Certificate shall indicate that the Owner ... [is an] ADDITIONALLY INSURED.

Bill Rich Construction purchased several liability insurance policies from appellee Commercial Union Insurance Company ("Commercial Union"). During the 1987–1988 contract period, Commercial Union insured the contractor under a commercial general liability policy with $500,000.00 in coverage for each occurrence, and $500,000.00 in aggregate coverage. Commercial Union also provided Bill Rich Construction with an umbrella policy with liability limits of $2,000,000.00 for each occurrence, and $2,000,000.00 in aggregate coverage.

Bill Rich Construction purchased its insurance coverage through B & W Insurance Agency, a licensed and authorized insurance agent for Commercial Union. In accordance with the requirements in the construction contract, Bill Rich Construction arranged for the insurance agent to issue an "Acord 25 (2/84)"[5] certificate of insurance that described the Wetzel County Board of Education as an "additionally insured" and as a certificate holder. The record contains the certificate of insurance, which was apparently delivered to the Board.[6]

In the Fall of 1987, the renovations to Hundred High School began with Bill Rich Construction as the general contractor for the project. During the renovations, throughout 1988, workers dismantled ceilings, walls and floors that were constructed of asbestos-containing materials. The workers allege that they were repeatedly exposed to high levels of asbestos dust.

In 1990, many of the workers on the project and their families filed suit against, *inter alia*, the Board and Bill Rich Construction, alleging that the defendants knew or should have known about the presence of asbestos, and that the defendants negligently failed to warn the workers of the existence of asbestos or to protect the workers from harmful levels of asbestos dust. The workers also alleged that the defendants fraudulently, deceitfully and willfully, wantonly and recklessly concealed from the workers the fact that they were being exposed to unsafe levels of asbestos. The workers sought compensation for their fear of contracting an asbestos-related disease in the future, and for medical costs to test for the potential future development of an asbestos-related disease. See *Marlin v. Bill Rich Construction, Inc.*, 198 W.Va. 635, 482 S.E.2d 620 (1996).

Based upon the indemnification clauses in the contract between the Board and Bill Rich Construction, and upon the certificate of insurance listing the Board as an additional insured on both the general liability and umbrella policies, the Board demanded that Commercial Union assume the Board's legal defense and agree to indemnify the Board in the litigation filed by the workers.

Commercial Union refused to provide coverage, contending that it was only obliged to provide coverage to Bill Rich Construction under the policies. Commercial Union took the position that the indemnification provisions in the construction contract did not change the insurance contract with Bill Rich Construction.

Furthermore, Commercial Union asserted that its agent, B & W Insurance Agency, did not notify Commercial Union that the Board was to be added to the insurance policies as an additional insured. The insurance company asserted that it never received either the certificate of insurance or any other document suggesting the insurance policies

---

**5.** Prior to 1976, insurance companies used their own forms for certificates of insurance. In that year, the Agency Company Organized Research Development (ACORD) introduced the first standard certificate of insurance. ACORD certificates are available for insurance companies to provide evidence of property and casualty insurance, and are updated from time to time. ACORD also offers a training guide that provides suggestions for the proper issuance of certificates. Donald S. Malecki, *et al., The Additional Insured Book* 342 (4th Ed.2000).

**6.** The certificate of insurance, issued on September 14, 1987, indicates that American Contractors is the "insured," and Commercial Union Insurance Company is the "compan[y] affording coverage." The certificate certifies that certain "policies of insurance listed below have been issued to the insured named above for the policy period indicated"—including the aforementioned general liability and umbrella policies. Near the bottom of the certificate, in a box titled "Description of operations/locations/vehicles/special items," it states: "Additionally insured Wetzel County Board of Education." The Board is also listed as a "Certificate Holder."

needed to be amended. Despite the errors committed by its agent, Commercial Union argued that the certificate of insurance was issued, by its own terms, for "information only," and could not alone modify the policies to extend coverage. Commercial Union points to disclaimer language prominently on the certificate of insurance which states:

This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policies below.

The certificate of insurance also contains the following disclaimer:

This is to certify that [the] policies of insurance listed below have been issued to the insured named above for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies.

Commercial Union contended that there was no coverage available to the Board under the certificate because it issued no amendments or alterations to the actual insurance policy to extend coverage to the Board, and because the certificate, by its own terms, could not amend or alter the policy.

The Board subsequently filed a third-party complaint for a declaratory judgment against Commercial Union, contending that it was an "additional insured" under the policies at issue. After substantial discovery, the parties both filed motions for summary judgment.

In an order dated January 5, 2001, the circuit court denied the Board's motion for summary judgment and granted Commercial Union's motion. The circuit court concluded that because of the prominent disclaimer language on the certificate of insurance, the Board could not have reasonably expected coverage under the insurance policies at issue. Furthermore, the circuit court conclud-

ed that there was no provision in the insurance policies requiring Commercial Union to provide coverage to the Board merely because of the indemnity provisions in the construction contract with Bill Rich Construction.

The Board now appeals the circuit court's January 5, 2001 order.

## II.

### *Standard of Review*

This Court reviews a circuit court's entry of a declaratory judgment *de novo,* because the principal purpose of a declaratory judgment action is to resolve legal questions. Syllabus Point 3, *Cox v. Amick,* 195 W.Va. 608, 466 S.E.2d 459 (1995). When a declaratory judgment proceeding involves the determination of an issue of fact, that issue may be tried and determined by a judge or a jury, just as issues of fact are tried and determined in other civil actions. *W.Va.Code,* 55–13–9 [1941].[7] *See also,* Syllabus Point 16, *Mountain Lodge Ass'n v. Crum & Forster Indem. Co.,* 210 W.Va. 536, 558 S.E.2d 336 (2001) ("West Virginia Code § 55–13–9 and Rules 38, 39 and 57 of the Rules of Civil Procedure, read and considered together, operate to guarantee that any issue triable by a jury as a matter of right in other civil actions cognizable by the circuit courts shall, upon timely demand in a declaratory judgment proceeding, be tried to a jury."). Any determinations of fact made by the circuit court or jury in reaching its ultimate judgment are reviewed under a clearly erroneous standard. *Cox,* 195 W.Va. at 612, 466 S.E.2d at 463.

In this case we are asked to review the circuit court's interpretation of an insurance contract. In Syllabus Point 2 of *Riffe v. Home Finders Associates, Inc.,* 205 W.Va. 216, 517 S.E.2d 313 (1999), we stated that "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination

7. *W.Va.Code,* 55–13–9 [1941] states:
When a proceeding under this article involves the determination of an issue of fact, such issue may be tried and determined in the same

manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending.

that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal." "Determination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." Syllabus Point 1, *Tennant v. Smallwood,* 211 W.Va. 703, 568 S.E.2d 10 (2002). *See also, Murray v. State Farm Fire & Cas. Co.,* 203 W.Va. 477, 482, 509 S.E.2d 1, 6 (1998).

### III.

### *Discussion*

The Board is asserting it is entitled to coverage under two policies of insurance issued by Commercial Union: a general liability policy, and an umbrella policy. The Board argues it is entitled to coverage under the general liability policy because the construction contract with Bill Rich Construction was a contract insured by the policy. The Board also argues that because it relied upon the misrepresentation in the certificate of insurance that it was an "additional insured" under both policies, under the doctrine of estoppel Commercial Union cannot now deny coverage.

We consider both of these arguments in turn.

### A.

### *Coverage for an "Insured Contract"*

The Board argues that the policy language of Commercial Union's general liability policy issued to Bill Rich Construction clearly contemplates and covers liability assumed by one of its insureds under any written contract or agreement. The Board takes the position that the coverage is therefore extended to the Board directly. Commercial Union, however, argues that its insurance policy does not contain an "insured contract" provision, and therefore argues it has no direct duty to provide coverage or a defense to the Board.

■ Our law in this area is clear. We stated in Syllabus Point 7 of *Consolidation Coal Co. v. Boston Old Colony Ins. Co.,* 203 W.Va. 385, 508 S.E.2d 102 (1998) that:

In a policy for commercial general liability insurance . . . when a party has an "insured contract," that party stands in the same shoes as the insured for coverage purposes.

The question we must resolve, therefore, is whether the construction contract between Bill Rich Construction and the Board is an "insured contract" under the Commercial Union general liability policy.

The construction contract between the Board and Bill Rich Construction contained an indemnification provision such that Bill Rich Construction was required to "indemnify and hold harmless" the Board "from and against all claims, damages, losses and expenses including but not limited to attorneys fees, arising out of or resulting from the performance of the Work[.]" West Virginia law allows indemnity provisions in contracts because "indemnity clauses serve our goals of encouraging compromise and settlement by reducing settlement discussions to bilateral discussions, by encouraging adequate levels of insurance, and by allowing the parties to a contract to allocate among themselves the burden of defending claims." *Dalton v. Childress Service Corp.,* 189 W.Va. 428, 431, 432 S.E.2d 98, 101 (1993) (emphasis omitted). Indemnification and hold harmless agreements are a means of shifting the financial consequences of a loss, and are essentially non-insurance contractual risk transfers.

The Commercial Union general liability policy[8] issued to Bill Rich Construction states that the insurance company will "cover all sums which the insured is legally required to pay as damages because of bodily injury or property damage." Commercial Union cites to two policy exclusions that are intended to narrow this coverage; however, neither of these exclusions apply to eliminate coverage for any "liability assumed by the insured under contract." One exclusion from coverage is for any "bodily injury to any employee of the insured . . . or to any obligation of the insured to indemnify another because of such injury," but the exclusion goes on to state that it "does not apply to liability assumed by the insured under contract." The other pro-

8. The record suggests the policy was drafted in 1983.

vision excludes coverage for any "liability assumed by the insured under any oral or written contract or agreement," but only "if such injury or damage occurred prior to the execution of such contract or agreement."

What is meant by the phrase "liability assumed by the insured under contract" in insurance policies has been the topic of litigation in other jurisdictions. An Alaska case— *Olympic, Inc. v. Providence Washington Ins. Co.,* 648 P.2d 1008, 1011 (Alaska 1982)— provides the following explanation for the phrase:

> "Liability assumed by the insured under any contract" refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to the liability that results from breach of contract.

The phrase does not provide coverage for liability caused by a breach of contract; rather, the coverage arises from a specific contract to assume liability for another's negligence. The phrase has been interpreted "to apply only to indemnification and hold-harmless agreements, whereby the insured agrees to 'assume' the tort liability of another." *Gibbs M. Smith, Inc. v. U.S.F. & G.,* 949 P.2d 337, 341 (Utah 1997).

■ We hold that the phrase "liability assumed by the insured under any contract" in an insurance policy, or words to that effect, refers to liability incurred when an insured promises to indemnify or hold harmless another party, and thereby agrees to assume that other party's tort liability.

■ Our examination of the language of the construction contract and the general liability insurance policy leads us to conclude that the construction contract between the Board and Bill Rich Construction was an "insured contract." The Commercial Union general liability insurance policy insured any sums which Bill Rich Construction was "legally required to pay as damages because of bodily injury or property damage," including any liability for bodily injury or property damage assumed by Bill Rich Construction under the indemnification provisions of the construction contract. The construction contract clearly shifted legal responsibility for

some measure of the plaintiff-workers' alleged tort liability from the Board to Bill Rich Construction, and thereby, to Commercial Union. In accordance with our holding in Syllabus Point 7 of *Consolidation Coal Co. v. Boston Old Colony Ins. Co., supra,* because the Board had an "insured contract" with Bill Rich Construction, the Board stands in the same shoes as Bill Rich Construction for coverage purposes.

Accordingly, we hold that because of the language contained in the Commercial Union general liability policy, the Board "stands in the same shoes" as Bill Rich Construction and may directly seek coverage under the policy. We therefore find that the circuit court erred in holding that Commercial Union was not obligated to provide the Board with a legal defense and coverage under the general liability policy at issue.

## B.

### *Coverage under the Certificate of Insurance*

■ The Board argues that it is an "additional insured" under both insurance policies at issue—the general liability policy and the umbrella policy. The Board argues that because an agent for Commercial Union issued a certificate of insurance listing the Board as an additional insured under both policies, the Board reasonably relied upon that representation to its detriment and thereby allowed Bill Rich Construction to perform the construction work without adequate insurance coverage. Because the Board relied to its detriment on Commercial Union's misrepresentation of coverage, the Board argues that Commercial Union is now prevented under the doctrine of estoppel from denying the representation made on the certificate.

Commercial Union does not dispute that its agent issued a certificate of insurance listing the Board as an additional insured. Instead, Commercial Union argues that it had no knowledge of the certificate's existence, and therefore could not modify the actual policy to include coverage for the Board. For example, Commercial Union points out that neither the Board nor Bill Rich Construction paid additional premiums for the alleged additional coverage. Com-

mercial Union asserts that disclaimer language on the face of the certificate of insurance should have made clear to any reader—including the Board—that no right to coverage was created by the certificate. In other words, Commercial Union contends that because no firm representation of the existence of coverage was ever made, and the Board could not have reasonably relied on the certificate as evidence of coverage, the doctrine of estoppel does not apply.[9]

We begin our analysis by considering the purpose of certificates of insurance. As previously mentioned, parties to a contract may contractually shift a risk of loss through an indemnity provision in the contract. The "indemnitee" in the contract can also require the "indemnitor" to provide some insurance protection for the indemnitee. However, while

> [i]ndemnitees can make very specific and comprehensive contractual requirements concerning the protection to be afforded, ... they have very few alternatives for verifying that indemnitors have complied with them....
>
> The certificate of insurance is the primary vehicle for verification that insurance requirements have been met.

Donald S. Malecki, *et al., The Additional Insured Book* 341 (4th Ed., 2000).

 A certificate of insurance is a form that is completed by an insurance broker at the request of an insurance policyholder, and is a document evidencing the fact that an insurance policy has been written and includes a statement of the coverage of the policy in general terms. *Black's Law Dictionary* (5th Ed.1979). A certificate of insurance "serves merely as evidence of the insurance and is not a part of the insurance contract." Richard H. Glucksman, *et al.,* "Additional Insured Endorsements: Their Vital Importance in Construction Defect Litigation," 21 *Construction Lawyer* 30, 33 (Winter 2001). "[C]ertificates provide evidence that certain general types of policies are in place on the date the certificate is issued and that these policies have the limits and policy periods shown." Malecki, *supra* at 341.

A problem with certificates of insurance, which appears to be common in indemnification contracts such as that in the instant case,[10] is that insurance agents often issue certificates of insurance detailing a particular form of coverage, but then fail to notify the insurance company of the need to alter or amend the coverage to match the certificate. The result is that the insurance company—like in the instant case—refuses to provide coverage. As one commentator notes,

> Although a broker for the subcontractor [policyholder] may have prepared the certificate of insurance, in many cases he or she did not follow through and actually obtain the necessary endorsement.... As

9. Commercial Union also argues that, because the certificate of insurance states that the general liability and umbrella policies were only valid through January 1, 1988, any injuries to the plaintiffs during 1988 are not covered by the policies. We believe this argument is baseless, because both policies were renewed with identical policy language and coverages through the performance period of the construction contract. The only change was the internal numbering system for the policies in effect used by Commercial Union.

10. *See, e.g., Lenox Realty Inc. v. Excelsior Ins. Co.,* 255 A.D.2d 644, 679 N.Y.S.2d 749 (1998) (insurance agent listed parking lot owner as an additional insured on certificate of insurance on policy purchased by snow removal subcontractor; although insurance agent stated it was "routine procedure" to send a copy of certificates to the insurance company, coverage was not amended to add parking lot owner to policy); *Zurich Ins. Co. v. White,* 221 A.D.2d 700, 633 N.Y.S.2d 415 (1995) (insurance agent issued certificate of insurance to state department of transportation certifying that there were no deductibles to coverage provided to painting contractor for the state; insurance company later asserted a $500 per claim deductible for property damage claims caused by painting overspray); *Criterion Leasing Group v. Gulf Coast Plastering & Drywall,* 582 So.2d 799 (Fla.App.1991) (insurance agent issued certificate of insurance listing subcontractor as covered by workers' compensation insurance without amending policy to add workers' compensation coverage); *Bucon, Inc. v. Pennsylvania Mfg. Assoc. Ins. Co.,* 151 A.D.2d 207, 547 N.Y.S.2d 925 (1989) (pursuant to indemnity agreement between contractor and subcontractor, insurance agent issued certificate of insurance listing contractor as an additional insured on subcontractor's policy, but failed to notify insurance company to change policy coverage; insurance company argued that inclusion of contractor on certificate of insurance was a "clerical error").

a result, although a developer may hold a certificate that states it is named as an additional insured on the subcontractor's policy of insurance, the subcontractor's carrier will deny the tender of defense and contend that the agent did not have express authority to bind the carrier.

*Glucksman,* at 33.[11]

A treatise on "additional insureds" suggests that the fact pattern in the instant case is "the most common area" of conflict involving certificates of insurance. As. the treatise states:

> Probably the most common area in which certificates of insurance and insurance policies conflict is with respect to additional insured status. Certificate holders are often listed as additional insureds on certificates without the policy actually being endorsed to reflect that intent. An extreme case of this that often occurs is for a copy of an additional insured endorsement to be attached to the certificate but not the policy. This practice may not provide additional insured status and, thus, is sometimes called the "fictitious insured syndrome."
>
> Sometimes this problem stems from a lack of communication. The insurance agent, for example, may have the authority to add another party to a policy as an additional insured and may issue a certificate indicating that this has been done while forgetting to ask the insurer to issue the endorsement. When the insured later seeks protection, the insurer denies protection, shifting the blame elsewhere.
>
> This, of course, is really a matter of principal-agency liability and should not detrimentally affect the certificate holder. However, concise wording in the certificate's preamble indicating that the certificate is "for information only" fosters an insurance company's opportunity to deny any protection. . . .
>
> The insurance company maintains that it does not matter what the certificate says, it is what the policy states that counts. . . .

*Malecki, supra* at 345–46. The insurance company in this case makes the same argument: it does not matter that the certificate of insurance says that the Board is an additional insured, it is what the policy states— or, more particularly, does not state—that counts.

The Board argues that it reasonably relied to its detriment upon representations of coverage made by Commercial Union in its certificate of insurance, and therefore Commercial Union should be estopped from denying coverage.

---

11. In some instances, insurance companies attempt to avoid liability by asserting policy exclusions which are inconsistent with the coverage noted in the certificate of insurance. One commentator indicates that some courts do not give these exclusions effect:

> Certificates of insurance are often inconsistent with the related policy, and a prudent indemnitee should assume exclusions in the policy exist that do not appear on the certificate. In some jurisdictions, certificates do not govern coverage while in others, an exclusion of which a certificate holder is unaware will not be given effect.

Douglas R. Richmond, *et al.,* "Expanding Liability Coverage: Insured Contracts and Additional Insureds," 44 Drake L.Rev. 781, 796 (1996). *See also, Brown Mach. Works & Supply Co. v. Ins. Co. of North America,* 659 So.2d 51, 56 (Ala.1995) (holding that an insurance company that does not deliver a policy to a certificate holder is estopped from asserting exclusions contained in the policy but not revealed in the certificate); *Moore v. Energy Mut. Ins. Co.,* 814 P.2d 1141, 1144 (Utah App.1991) (holding that exclusions are invalid unless they are communicated to the certificate holder in writing); *J.M. Corbett Co. v. Ins. Co. of North America,* 43 Ill.App.3d 624, 2 Ill.Dec. 148, 357 N.E.2d 125 (1976) (holding that because exclusion was not provided to certificate holder, terms of the certificate controlled).

A similar situation occurs in the context of medical, disability or other types of group insurance, where insureds are often given a certificate as evidence of coverage but are never given a copy of the master policy. The majority rule is that the coverage provisions stated in a certificate of coverage furnished to an insured by the insurance company takes precedence over conflicting terms in the master policy. *See* "Group Insurance: Binding Effects of Limitations on or Exclusions of Coverage Contained in Master Group Policy But Not in Literature Given Individual Insureds," 6 A.L.R.4th 835 (1981). *Cf.,* Syllabus Point 3, *Romano v. New England Mut. Life Ins. Co.,* 178 W.Va. 523, 362 S.E.2d 334 (1987) ("Where an insurer provides sales or promotional materials to an insured under a group insurance policy, which the insurer knows or should know will be relied upon by the insured, any conflict between such materials and the master policy will be resolved in favor of the insured.")

The doctrine of estoppel "applies when a party is induced to act or to refrain from acting to [his/]her detriment because of [his/]her reasonable reliance on another party's misrepresentation or concealment of a material fact." Syllabus Point 2, in part, *Ara v. Erie Ins. Co.*, 182 W.Va. 266, 387 S.E.2d 320 (1989). Estoppel is properly invoked to prevent a litigant from asserting a claim or a defense against a party who has detrimentally changed its position in reliance upon the litigant's misrepresentation or failure to disclose a material fact. *Ara*, 182 W.Va. at 270, 387 S.E.2d at 324. The doctrine is "designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to the demands of justice and good conscience." *White v. Austin*, 172 N.J.Super. 451, 454, 412 A.2d 829, 830 (1980).

In *Potesta v. U.S.F. & G.*, 202 W.Va. 308, 504 S.E.2d 135 (1998), we suggested that the doctrine of estoppel may not be used to create insurance coverage, or increase coverage beyond that provided by the policy. We stated, at Syllabus Point 5, that:

> Generally, the principles of waiver and estoppel are inoperable to extend insurance coverage beyond the terms of an insurance contract.

The rationale for this rule is that an insurance company should not be made to pay for a loss for which it has not charged a premium. *See* "Doctrine of Estoppel or Waiver as Available to Bring Within Coverage of Insurance Policy Risks Not Covered by its Terms or Expressly Excluded Therefrom," 1 A.L.R.3d 1139, 1144 (1965).

There are, however, numerous recognized exceptions to this rule. We held in *Potesta* at Syllabus Point 7 that the some of the exceptions "include, but are not necessarily limited to" the following:

> Exceptions to the general rule that the doctrine of estoppel may not be used to extend insurance coverage beyond the terms of an insurance contract, include, but are not necessarily limited to, instances where an insured has been prejudiced because: (1) an insurer's, or its agent's, misrepresentation made at the policy's inception resulted in the insured being prohibited from procuring the coverage s/he desired; (2) an insurer has represented the insured without a reservation of rights; and (3) the insurer has acted in bad faith.

These exceptions have been used "to create insurance coverage where to refuse to do so would sanction fraud or other injustice." *Crown Life Ins. Co. v. McBride*, 517 So.2d 660, 662 (Fla.1987).

In the instant case we focus our analysis on the first exception, whether the insurer or its agent made a misrepresentation by issuing a certificate of insurance at the inception of coverage which resulted in the Board not having the coverage it desired. Our research indicates that

> [i]t is well settled that an insurer may be equitably estopped from denying coverage where the party for whose benefit the insurance was procured reasonably relied upon the provisions of an insurance certificate to that party's detriment.

*Lenox v. Excelsior Ins. Co.*, 255 A.D.2d 644, 645, 679 N.Y.S.2d 749, 750 (1998) (citations omitted). *See also, Zurich Ins. Co. v. White*, 221 A.D.2d 700, 633 N.Y.S.2d 415 (1995) (insurer was estopped from asserting deductibles to liability coverage when certificate of insurance represented there were no deductibles); *Criterion Leasing Group v. Gulf Coast Plastering & Drywall*, 582 So.2d 799 (Fla.App.1991) (under doctrine of promissory estoppel, insurer was prevented from denying workers' compensation coverage to subcontractor's employee when subcontractor was named as a "coinsured" on certificate of insurance); *Bucon, Inc. v. Pennsylvania Mfg. Assoc. Ins. Co.*, 151 A.D.2d 207, 547 N.Y.S.2d 925 (1989) (insurer estopped from denying the existence of plaintiff's coverage after issuing certificate of insurance identifying the plaintiff as an "additional insured"). "A Certificate of Insurance is an insurance company's written statement to its customer that he has insurance coverage, and the insurance company is estopped from denying coverage that the Certificate of Insurance states is in effect." *Blackburn, Nickels & Smith, Inc. v. National Farmers Union Property and Cas. Co.*, 482 N.W.2d 600, 603 (N.D.1992).

We therefore hold that a certificate of insurance is evidence of insurance coverage, and is not a separate and distinct contract for insurance. However, because a

certificate of insurance is an insurance company's written representation that a policyholder has certain insurance coverage in effect at the time the certificate is issued, the insurance company may be estopped from later denying the existence of that coverage when the policyholder or the recipient of a certificate has reasonably relied to their detriment upon a misrepresentation in the certificate.

Examining the record, we believe that the elements of estoppel against Commercial Union's denial of coverage have been established by the Board. At the inception of "coverage" for the Board, on September 14, 1987, an agent for Commercial Union prepared a certificate of insurance naming the Board as an additional insured. The insurance company's "bare, conclusory averment that the certificate naming plaintiff [the Board] as an additional insured was the result of 'clerical error' was insufficient to overcome the estoppel effect of its misrepresentation, since even an innocent misleading of another party may bar one from claiming the benefits of his deception." *Bucon, Inc., v. Pennsylvania Mfg. Assoc. Ins. Co.*, 151 A.D.2d 207, 211, 547 N.Y.S.2d 925, 927 (1989). *See also, Potesta v. U.S.F. & G.*, 202 W.Va. at 321, 504 S.E.2d at 148, *citing Harr v. Allstate Ins. Co.*, 54 N.J. 287, 255 A.2d 208 (1969) (finding equitable estoppel is available to broaden coverage when there is a misrepresentation before or at the inception of the insurance contract, even where the misrepresentation is innocent).

The circuit court therefore erred in holding that the certificate of insurance did not create an obligation for Commercial Union to provide the Board with a legal defense and coverage under both the general liability and umbrella policies at issue.

### IV.

#### Conclusion

The circuit court's January 5, 2001 order is reversed, and the case is remanded for further proceedings.

Reversed and Remanded.