542 S.E.2d 58

John Michael AYERSMAN, Plaintiff
Below, Appellant,

v.

WEST VIRGINIA DIVISION OF ENVI-
RONMENTAL PROTECTION, Perland
Construction, Inc., A West Virginia Cor-
poration, and Gai Consultants, Inc., A
Pennsylvania Corporation, Defendants
Below, Appellees.

No. 27472.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 20, 2000.

Decided Nov. 22, 2000.

Concurring Opinion of Justice
McGraw Jan. 12, 2001.

Gregory W. Sproles, Esq., Breckenridge, Davis & Sproles, P.L.L.C., Summersville, for Appellant.

Gary E. Pullin, Esq., Mark E. Troy, Esq., Pullin, Knopf, Fowler & Flanagan, Charleston, for Appellee, West Virginia Division of Environmental Protection.

PER CURIAM.

Appellant and plaintiff below, John Michael Ayersman, appeals a grant of summary judgment awarded in favor of appellee and defendant below, the West Virginia Department of Environmental Protection (the "DEP"). Mr. Ayersman argues that the lower court erred when it found that the DEP's insurance policy did not cover the activity alleged to have damaged appellant's property. We find the lower court's summary judgment order insufficient to permit meaningful appellate review and reverse on that basis.

## I.

## BACKGROUND

Appellant Ayersman is a resident of Fayette County, West Virginia. In 1992, Mr. Ayersman built a two-bay garage in which he established a small auto-repair business. The garage is located on Summerlee Road in rural Fayette County, along which flows a stream known as Wolf Creek. From the record it appears that the creek flows along the road, but as both approach Mr. Ayersman's property, the creek flows away from the road and passes behind Mr. Ayersman's garage. Although the creek was there before the construction of the garage, Mr. Ayersman claims that he experienced no flooding on his land before 1995.

In the spring of 1995, appellee and defendant below, the West Virginia Department of Environmental Protection, commenced reclamation work at a large coal refuse pile some distance upstream from Mr. Ayersman's garage. Like many sites in West Virginia, this abandoned mine site produced water quality problems and safety concerns for area residents. Specifically, the site contained several settlement ponds containing water and coal waste, and part of the site had caught fire and burned continuously. Water passing through the waste pile and its ponds eventually migrated to Wolf Creek, producing silting problems and a possible increase in the level of iron in the stream.

Under the Abandoned Mine Lands and Reclamation Act, W. Va.Code § 22–2–1, *et seq.*, DEP is charged with the duty of reclaiming abandoned mine sites in West Virginia. DEP contracted with G.A.I. Consultants to design a project whereby workers would grade and revegetate the site, remove the existing settling ponds, and divert water around, rather than through, the refuse pile. DEP chose Perland Construction to do the earth-moving work.

After a rain on June 14, 1995, the creek next to Mr. Ayersman's property flooded extensively, overflowing its banks and inundating the garage. Since that time, the creek has flooded repeatedly. Despite Mr. Ayersman's efforts to divert some of the water with culverts or berms, the water has flooded the shop on several subsequent occasions. This flooding has caused Mr. Ayersman considerable damage in destroyed property and lost business. As a result, Mr. Ayersman sued the DEP, the design consultant and the engineering firm on January 17, 1997.

DEP argued that, because its insurance policy contained an exclusion for "pollution clean up"[1] work, that there was no coverage for the damages to Mr. Ayersman. DEP claims that, because our law allows a suit against a state entity like DEP only if insurance coverage exists, DEP was, therefore, immune from suit. The lower court agreed

---

1. We quote the policy language in our discussion, *infra.*

with this argument and granted summary judgment against Mr. Ayersman and in favor of DEP. Mr. Ayersman now appeals.

## II.

## STANDARD OF REVIEW

■ At issue in this case is the validity of the lower court's grant of summary judgment. Our touchstone for reviewing a grant of summary judgment is set out in *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.*, 148 W.Va. 160, 133 S.E.2d 770 (1963), wherein we held: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *Accord, Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995); *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). ·

## III.

## DISCUSSION

■ The parties devote much of their briefs to arguing the niceties of the insurance policy, and whether or not DEP's conduct arose from "pollution related" activities, as defined in the policy. The language at issue reads:

This insurance does not apply:

2) To any loss, cost or expense arising out of any governmental direction or request that the "Named Insured" test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkal-

is, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

DEP claims, because it was "clean[ing] up" what were "pollutants" at the mine site, that even if this activity caused the flooding, DEP is immune from suit because no insurance policy covered its actions. Mr. Ayersman argues that DEP, as a government entity, was not acting under "governmental direction or request," and that the coal refuse and settlement ponds were not "pollution" in the usual sense of the word.[2] Because we find that the lower court's order failed to meet the test we have established for summary judgment orders, we need not wrestle with any policy definitions to decide this matter.

We have held that a summary judgment order must set forth findings substantial enough to allow this Court to make an informed judgment on the propriety of the lower court's actions. "[O]n summary judgment, a circuit court must make factual findings sufficient to permit meaningful appellate review." *Gentry v. Mangum*, 195 W.Va. 512, 521, 466 S.E.2d 171, 180 (1995). We have explained that a conclusory order simply stating that "no issue of material fact is in dispute" will not suffice. "For meaningful appellate review, more must be included in an order granting summary judgment. This Court's function, as a reviewing court is to determine whether the stated reasons for the granting of summary judgment by the lower court are supported by the record." *Fayette County Nat. Bank v. Lilly*, 199 W.Va. 349, 353, 484 S.E.2d 232, 236 (1997).

■ We went on to establish a new syllabus point in *Lilly* describing what is required in an order granting summary judgment:

---

2. We note that the reclamation of abandoned mine sites is a primary function of DEP.

[I]t is the intent of the Legislature by this article to vest jurisdiction and authority in the director of the division of environmental protection to maintain program approval by, and receipt of funds from, the United States department of the interior to accomplish the desired restoration and reclamation of our land and water resources.

W. Va.Code § 22–2–2 (1994). Thus, DEP is in the unique position that it is charged with the

restoration of sites left abandoned by others; DEP does not operate plants, factories, or mines of its own that might result in a "governmental direction or request ... to clean up ... pollutants." To the contrary, DEP actually *is* a government entity that directs or requests others to clean up pollutants.

Thus, the exclusion at issue seems particularly ill-suited for a policy written for the DEP. While we do not find it necessary to make a detailed analysis of the policy to resolve this appeal, we are skeptical of any policy language that purports to exclude a primary function of the insured.

Although our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.

Syl. pt. 3, *Fayette County Nat. Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997).

 In the case *sub judice*, the lower court discussed the DEP's alleged immunity, but did not provide the factual basis for its decision:

It appears that Defendant, DEP, having duly raised governmental immunity, is entitled to be dismissed from this action. The State of West Virginia's insurance policy specifically excludes coverage for actions in the clean-up of pollutants, as occurred here, and under *Pittsburgh Elevator v. W. Va. Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), in order to escape the constitutional bar to suits against the State, insurance proceeds must be sought. As is recognized [by the] parties, DEP is considered the State under the immunity analysis, and consequently, the DEP is immune because of the lack of insurance coverage, unless it has created a "special relationship" with the Plaintiff under the public duty doctrine.

The order then goes on to discuss the public duty doctrine in greater detail.[3] What the court does not reveal is what findings, if any, it made with regard to the facts at issue. That is, presuming that the court has made a threshold determination that the exclusion could apply to abandoned mine reclamation activity,[4] the court did not make findings on whether or not the DEP was directed by "governmental direction or request" or whether or not the work performed on the mine site constituted pollution abatement as defined in the policy.[5]

## IV.

## CONCLUSION

We hold, therefore, that the circuit court committed reversible error by granting summary judgment without including sufficient findings of fact and conclusions of law in its final order. For the reasons stated, the judgment of the Circuit Court of Kanawha County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

McGRAW, Justice, concurring.

(Filed Jan. 12, 2001)

While I agree with the majority that this case should be reversed, I would reverse for different reasons. In my view the issues of the definition of pollution or the sufficiency of the circuit judge's actions are red herrings.

At issue in this case is an insurance policy for the DEP that purports, on its face, to exclude coverage for pollution abatement work. This sort of exclusion might make sense for a standard commercial or industrial policy where, for example, an insurer wishes to avoid liability for the removal of asbestos from a insured company's older manufacturing plant. Indeed, this exclusionary language probably originated in such a policy. But in a policy for an agency that has as a primary goal, if not in fact its *raison d'etre*,

---

**3.** While we feel that the facts of this case do not implicate the so-called "public duty doctrine," we need not address what impact the court's application of this doctrine might have on the case's outcome, as we are reversing on other grounds.

**4.** Nor did the court address the potential ambiguity created by the confusing "governmental request" language contained in a policy that was issued *to* a governmental entity.

**5.** Nor does the court's order address the fact that, as a matter of law, the DEP (or its insur-

ance company) bears the burden of showing that the activity is actually excluded by the policy:

Where the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated.

An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion.

Syl. pts. 5, 7, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987).

548

the abatement of pollution, such an exclusion is patently absurd.

This would be akin to issuing an insurance policy for a NASCAR driver that refused to provide coverage for "claims arising from the operation of a motor vehicle at speeds above 70 miles per hour." For "Joe Driver" that exclusion might be reasonable; for "Joe NASCAR Driver," it is ridiculous.

When an insurance carrier for the state makes such arguments it highlights a recurring problem with our law of immunity. Namely, that the state actually has a perverse incentive to NOT want insurance coverage when facing a large claim. Historically, the State of West Virginia had been immune from suit, as established in our State Constitution:

The State of West Virginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggested.

West Virginia Constitution, Section 35 of Article VI. However, in more recent times actions of this Court and the Legislature have gradually established exceptions to this general rule. In our seminal case on the subject, we ruled: "Suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." Syl. pt. 2, Pittsburgh Elevator Co. v. West Virginia Bd. of Regents, 172 W.Va. 743, 310 S.E.2d 675 (1983).

We have also explained that our law now requires the state to carry insurance for certain activities:

W. Va.Code, 29–12–5(a) (1986), provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution. It requires the State Board of Risk and Insurance Management to purchase or contract for insurance and requires that such insurance policy "shall provide that the insurer shall be barred and estopped from relying

upon the constitutional immunity of the State of West Virginia against claims or suits."

Syl. pt. 1, Eggleston v. West Virginia Dept. of Highways, 189 W.Va. 230, 429 S.E.2d 636 (1993). The Legislature has also recognized the strong desirability of maintaining insurance coverage:

Recognition is given to the fact that the state of West Virginia owns extensive properties of varied types and descriptions representing the investment of vast sums of money; that the state and its officials, agents and employees engage in many governmental activities and services and incur and undertake numerous governmental responsibilities and obligations; that such properties are subject to losses, damage, destruction, risks and hazards and such activities and responsibilities are subject to liabilities which can and should be covered by a sound and adequate insurance program;

W. Va.Code § 29–12–1. (1957).

A major problem with this system is that, because activity that is "not covered" by insurance is immune, the system inadvertently creates an incentive for the state's insurers and their lawyers to argue at every opportunity that a given activity is not covered by any insurance. This sentiment, which is the perverse opposite of the desires of a normal insured party who wants maximum coverage in an accident, runs counter to the goals of risk spreading and protection from catastrophic loss that our law has come to favor:

Although sovereign immunity provisions were common in nineteenth century state constitutions, today they are very much the exception rather than the rule. Our survey in Pittsburgh Elevator identified only five other states whose constitutions still contain sovereign immunity sections and only two (Alabama and Arkansas) with provisions as rigid as ours. 172 W.Va. at 749 n. 6, 310 S.E.2d at 681 n. 6. It may well be that the strict sovereign immunity imposed by Section 35 has outlived its perceived utility and that West Virginia should join the rest of the country and

adopt more flexible legislative resolutions to the issues surrounding governmental liability. Certainly, modern notions of fairness and accountability tend to support doctrines that provide relief to individuals injured by another's conduct and that spread the risk of loss from such injuries through governmental and insurance programs. The West Virginia Legislature, for example, following our decisions abolishing the common law immunities for local governments, crafted a comprehensive statute designed to accommodate the competing goals of compensating individuals injured by official misconduct and of maintaining the stability of local governments. See The Governmental Tort Claims and Insurance Reform Act, W. Va.Code, 29–12A–1, et seq.

*Gribben v. Kirk*, 195 W.Va. 488, 500, n. 12, 466 S.E.2d 147, 159, n. 12 (1995). In my view, this case is just another, though glaring, example of the problems inherent in our sovereign immunity jurisprudence. The time is soon coming, I believe, when this situation will improve.

Finally, I would have focused not on the order of the lower court, but upon the *McMahon* case mentioned by the majority in footnote 5, specifically: "Where the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." Syl. pt.5, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987).

Therefore I respectfully concur with the majority opinion. I am authorized to state that Justice Starcher joins in this concurrence.