664 S.E.2d 152

**Misty BLESSING, Individually and as the Administrator of the Estate of Wallie Blessing, Plaintiff Below, Appellant**

v.

**NATIONAL ENGINEERING & CONTRACTING COMPANY, a Foreign Corporation; Balfour Beatty Construction, Inc., a Foreign Corporation; and the West Virginia Department of Transportation, Division of Highways, An Agency of the State of West Virginia, Site–Blauvelt Engineers, Inc; Arrow Concrete Company; Arrow Concrete of West Virginia, Inc.; H.C. Nutting Company; and Byron Smith, P.E., Individually, Defendants Below, Appellees.**

No. 33433.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 27, 2008.

Decided April 25, 2008.

Concurring Opinion of Justice Benjamin June 23, 2008.

Concurring Opinion of Justice Starcher July 17, 2008.

Roger D. Williams, James P. McHugh, Charleston, for Appellant.

Eric R. Waller, Joanna I. Tabit, Steptoe & Johnson, PLLC, Charleston, for Appellees, National Engineering & Contracting Company; and Balfour Beatty Construction, Inc.

Timbera C. Wilcox, Robert M. Stonestreet, Dinsmore & Shohl, LLP, Charleston, for Appellees, West Virginia Department of Transportation, Division of Highways, and Byron Smith.

PER CURIAM:

Misty Blessing appeals from the September 13, 2006, order of the Circuit Court of Kanawha County granting summary judgment to Appellee West Virginia Department of Transportation (the "Department") in connection with a wrongful death action Appellant filed against the Department and its employee, Appellee Byron Smith. In granting summary judgment to the Department and Mr. Smith, the trial court ruled that the absence of insurance coverage barred Appellant from pursuing her claims under the doctrine of sovereign immunity. Upon our review of this matter, we think that a genuine issue of material fact exists as to the issue of insurance coverage in this case and, accordingly, we reverse.

### I. Factual and Procedural Background

On October 3, 2003, while working for Appellee National Engineering and Contracting Company ("NECC")[1] at a construction site known as the Man/Rita Bridge in Logan County, West Virginia, Appellant's husband Wallie Blessing sustained fatal injuries when the tremie scaffolding[2] on which he was working collapsed. Appellant instituted a wrongful death action on September 17, 2004, through which she asserted various negli-

---

1. NECC was the contractor the state hired to build the bridge.

2. A tremie scaffold is a specialized type of scaffolding which involves the use of a tremie pipe and a concrete hopper for purposes of pouring concrete into caissons that form the pillars that a bridge deck sits upon.

gence claims against the Department and Mr. Smith, the Department's project manager for the construction of the Man/Rita Bridge.[3]

In response to the lawsuit, the Department and Mr. Smith filed a motion for summary judgment, asserting that the circuit court lacked subject matter jurisdiction over them based on the doctrine of sovereign immunity.[4] After recognizing the inapplicability of sovereign immunity where recovery is sought solely from the state's insurer,[5] the trial court examined the state's liability policy and concluded that, unless "Mr. Blessing's injuries directly resulted from and occurred while 'employees of the State of West Virginia were physically present at the site of the incident . . . performing construction, maintenance, repair, or cleaning (but excluding inspection of work being performed or materials being used by others),'" there was no coverage under the applicable policy. Deciding that Mr. Smith's on-site duties "as the Project Supervisor d[id] not amount to performance of 'construction, maintenance, repair or cleaning,'" the circuit court determined that there was no insurance coverage under the state's liability policy and consequently ruled that Appellant's claims were barred by sovereign immunity.

Arguing that there are issues of fact as to the existence of insurance coverage that preclude this matter from being resolved without further factual inquiry, Appellant seeks a reversal of the lower court's grant of summary judgment.

## II. Standard of Review

A plenary standard of review applies to this appeal based on our recognition in *Gribben v. Kirk*, 195 W.Va. 488, 466 S.E.2d 147 (1995), that "appellate courts review questions involving principles of sovereign immunity *de novo.*" *Id.* at 493, 466 S.E.2d at 152. Our standard of review for the summary judgment ruling appealed from is similarly *de novo.* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 192 W.Va. 189, 451 S.E.2d 755 (1994). And, as is customary with our review of summary judgment rulings, the test we apply is to examine whether there remains any genuine issues of fact to be tried and whether further inquiry regarding the facts is desirable to clarify application of the law. *See id.* at 192, 451 S.E.2d at 758. Accordingly, we proceed to determine whether there are antecedent factual issues that must be resolved before a conclusive ruling can issue regarding the availability of coverage for Appellant's claims under the state's liability policy.

## III. Discussion

In syllabus point two of *Pittsburgh Elevator v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), we held that "[s]uits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." *See W.Va. Const.* art. VI, § 35. As we explained in *Pittsburgh Elevator*, the statutory prohibition found in West Virginia Code § 29–12–5(a)(4) (2004), which prevents insurers who issue policies to the State Board of Risk and Insurance Management ("Board of Risk") from relying on the state's grant of constitutional immunity, functions as a limited bar to sovereign immunity.[6] 172 W.Va. at 756, 310 S.E.2d at 688. Consequently, where the claims at issue are the subject of insurance procured by the Board of Risk and the state's general treasury is not directly sub-

---

3. Those claims were grounded in simple negligence, professional negligence, and premises liability.

4. *See W.Va. Const.* art. VI, § 35.

5. *See* Syl. Pt. 2, *Pittsburgh Elevator v. West Virginia Bd. of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983).

6. Despite our recognition in *Mellon–Stuart v. Hall*, 178 W.Va. 291, 296, 359 S.E.2d 124, 129 (1987), that the Legislature does not have the right to waive the constitutional grant of of sovereign immunity, as we explained in *Pittsburgh Elevator*, suits that seek recovery from insurance coverage rather than from the public purse logically fail to invoke the doctrine of sovereign immunity—a doctrine whose purpose is to prevent the diminution of funds from legislatively appropriated purposes. 172 W.Va. at 756–57, 310 S.E.2d at 688–89.

jected to risk, then the constitutional precept of sovereign "[i]mmunity is relaxed [but] only to the extent of the liability insurance coverage." *State ex rel. West Virginia Dept. of Transp. v. Madden,* 192 W.Va. 497, 500, 453 S.E.2d 331, 334 (1994).

In this case, Appellant is not seeking any recovery from the state's coffers.[7] For the necessary insurance coverage that would prevent sovereign immunity from serving as a bar to her claims, she looks to two separate policies as well as an indemnification agreement. The first policy was issued to the State of West Virginia by National Union Fire Insurance Company ("National Union") of Pittsburgh, Pennsylvania, and the second policy is one that was issued to Balfour Beatty Construction, Inc., the parent company of NECC, by Liberty Mutual. We will examine the availability of coverage separately as to each of these policies.

### A. National Union Policy

■ At the time of Mr. Blessing's fatality, the liability policy issued by National Union to the Department extended coverage to the state for certain acts of negligence. The parties are in agreement that the operative policy language is found in Endorsement No. 7, which modifies the coverage by providing:

> It is agreed that this insurance afforded under this policy does not apply to any claim resulting from the ownership, design, selection, installation, maintenance, location, supervision, operation, construction, use, or control of streets (including sidewalks, highways or other public thoroughfares), bridges, tunnels, dams, culverts, storm or sanitary sewers, rights-of-way, signs, warnings, markers, markings, guardrails, fences, or related or similar activities or things but **it is agreed that the insurance afforded under this policy does apply (1) to claims of "bodily injury" or "property damage" which both directly result from and occur while em-ployees of the State of West Virginia are physically present at the site of the incident at which the "bodily injury" or "property damage" occurred performing construction, maintenance, repair, or cleaning (but excluding inspection of work being performed or materials being used by others) and (2) to claims of** "bodily injury" or "property damage" which arise out of the maintenance or use of sidewalks which abut buildings covered by this policy, (emphasis supplied)

The trial court correctly found that by virtue of the exclusionary language set forth in Endorsement No. 7, no insurance coverage exists "unless Mr. Blessing's injuries directly resulted from and occurred while 'employees of the State of West Virginia were physically present at the site of the incident … performing construction, maintenance, repair, or cleaning (but excluding inspection of work being performed or materials being used by others)….' " As the basis for its ruling that coverage was nonexistent, the trial court ruled that "Mr. Smith's conduct as the Project Supervisor does not amount to performance of 'construction, maintenance, repair, or cleaning.' "

Appellant argues that the trial court erred in ruling that the record in this case is devoid of evidence indicating that "any employee of the State of West Virginia was physically present at the site of Wallie Blessing's accident 'performing construction, maintenance, repair, or cleaning….' " As support for her position, Mrs. Blessing cites to deposition excerpts of Byron Smith and Jack Hardin that were attached as exhibits to her response to the Department's motion for summary judgment, as well as answers to several interrogatories that were referenced and included in the same document. Appellant maintains that the deposition testimony of Messrs. Smith and Hardin[8] establish that the ongoing duties of Mr. Smith as a Project Engineer or Supervisor[9] were such that he

---

7. In her amended complaint, Appellant expressly pled that, as to the Department, she sought to recover under and only up to the limits of the liability insurance coverage in effect and applicable to the allegations in the complaint.

8. Mr. Hardin was an inspector employed by the state who reported on a daily basis to Mr. Smith as the Project Engineer at the construction site. Mr. Hardin described his duties as being "quality control" in nature.

9. At some point during the construction of the Man/Rita Bridge, Mr. Smith's classification by the state as an engineer in training (EIT 2) was upgraded to that of highway engineer 3.

was actively involved in the construction of the Man/Rita Bridge project and not just on site to perform inspection-related duties.

As the Project Supervisor or Project Engineer for the Department who was physically present at the time of the scaffolding collapse that led to Mr. Blessing's death, Appellant asserts that a review of Mr. Smith's duties demonstrates that he was engaged in the construction of the bridge on a day-to-day basis. In his capacity as the Project Engineer or Supervisor, Mr. Smith not only supervised the progress occurring on a daily basis but reserved the right to intervene and alter the work in progress upon observing any unsafe construction practices or methods. One such intervention occurred when Mr. Smith observed a "practice pour," and noted what appeared to be a "safety issue" with regard to the pour. In addition to monitoring the progress of the construction, Mr. Smith had the responsibility for approving progress payments to NECC.

In response to these arguments, the Department contends that its employees, including Mr. Smith, "are not actually performing any of the work attendant to the construction, but rather they are only inspecting the project to ensure that the contractor uses the correct materials and proceeds according to the contract specifications." Refuting Appellant's contention that the submitted deposition testimony provides evidence of work performed by Mr. Smith that should be viewed as construction related, the Department argues that the excerpted testimony only serves to reenforce its position that Mr. Smith's on-site work was limited to tasks that were solely inspection in nature.

■ As with many questions that require the interpretation of insurance policies, the definitions of key policy terms are either lacking or susceptible of multiple meanings. Neither the term "construction" nor the term "inspection" is defined within the National Union policy. Based on principles adopted for the construction of insurance contracts, Appellant argues that the term "inspection" should be narrowly defined so as not to include the tasks performed by Mr. Smith and, conversely, the term "construction" should be broadly defined in terms of encompassing the tasks Mr. Smith performed so as to find in favor of coverage. *See D'Annunzio v. Security–Connecticut Life Ins. Co.*, 186 W.Va. 39, 41, 410 S.E.2d 275, 277 (1991) (recognizing principle that "[w]hen reasonable people can differ about the meaning of an insurance contract, the contract is ambiguous, and all ambiguities will be resolved in favor of the insured"). Appellant suggests that the ambiguous meaning of the terms under discussion compels a ruling in favor of coverage based on the following construct: "It is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." Syl. Pt. 4, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987).

While not fully convinced of the interpretation that Appellant seeks to impose upon the insurance contract at issue,[10] we agree that additional factual inquiry is necessary to resolve this issue of contract interpretation. As the record is currently developed, we cannot definitively opine whether Mr. Smith was solely engaged in inspection rather than construction work while working on site at the Man/Rita Bridge. We do note, however, that Mr. Smith's deposition testimony suggests he viewed his job duties as "quality control"[11] in nature. Typically, quality con-

10. We must acknowledge the Department's contention that the coverage obtained under the National Union policy is specifically designed for instances when Department employees may be responsible "for an injury by virtue of their presence at the scene and the work they are performing." In contrast to the Department's performance of maintenance-related work on roads and bridges for which it is logical to presume the procurement of insurance coverage, the Department suggests that the work it performs for the purpose of "inspecting the project to ensure that the contractor uses the correct materials and proceeds according to the contract specifications" is outside the risks sought to be covered by the National Union policy under discussion. Moreover, as the Department observes, any injury attributable to the work performed by the contractor's employees is covered by the insurance policy the state requires the contractor to have in place.

11. In describing his job duties as a highway engineer on a project, Mr. Smith said as follows:
Well, the highway engineer is—it's just a classification. You can also be a project supervi-

trol connotes the inspection-related aspects of work rather than the work itself.

Given the questions that remain as to the extent of Mr. Smith's on-site involvement in the construction of the Man/Rita Bridge, we conclude that there is a genuine issue of material fact that precludes this matter from being resolved through summary judgment at this juncture. On remand, the scope of Mr. Smith's work should be more fully developed for purposes of determining whether the language of Endorsement No. 7, which undisputedly excludes coverage if Mr. Smith was engaged only in inspection-related activities at the time of the accident, is applicable.[12] Based on our uncertainty as to Mr. Smith's role in the construction at issue given the limited development of the record on this issue, we reverse the decision of the trial court on its ruling that there was no coverage under the National Union policy.

### B. Indemnification Agreement

As an alternate means of locating the insurance coverage necessary to avoid application of sovereign immunity principles, Appellant points to NECC's execution of an indemnification agreement under which it agreed to hold the Department and its employees "harmless from all liability for damage to persons or property that may accrue during and by reason of the acts or negligence of the Contractor [NECC], his agents, employees, or subcontractors if there be such." Appellant posits that the indemnification agreement "while not necessarily synonymous with insurance, is nevertheless the practical equivalent of 'insurance' for purposes of the analysis set forth in *Pittsburgh Elevator* ...." This argument does not withstand analysis.

As we explained in *Marlin v. Wetzel County Board of Education*, 212 W.Va. 215, 569 S.E.2d 462 (2002), indemnification agreements are by nature "essentially non-insurance contractual risk transfers." *Id.* at 221, 569 S.E.2d at 468. Without question, as the trial court determined, "in the event any liability for damage to persons or property were to accrue to the Department as a result of the facts and circumstances set for[th] ... in the Complaint, as amended, the hold harmless provision set forth in the contract between NECC and the Department would apply." Notwithstanding the potential application of a hold harmless agreement,[13] such an agreement and its risk-shifting provisions are not the functional equivalent of the liability insurance required by *Pittsburgh Elevator* for purposes of avoiding the bar of sovereign immunity. *See* 172 W.Va. at 744, 310 S.E.2d at 676, syl. pt. 2.

First and foremost, the indemnification agreement protects the Department from damages arising from the acts of NECC and its subcontractors. Any damages attributable to the acts of the Department and Mr. Smith are not covered by the hold harmless language of the agreement. Thus, the only risk-shifting that the indemnification agreement has the potential to effect [14] is as to the acts of non-governmental entities. Because the state would still be at risk for damages awarded in connection with either the actions of the Department or Mr. Smith, the foundational premise for sovereign immunity—protecting the state's purse—remains in place.

At the heart of our reasoning in *Pittsburgh Elevator* was a recognition that the fulcrum which enables suits to be instituted against the State and its agencies is the legislative

---

sor and do the same duties without having the actual degree or the license. But you're over a team of inspectors. You're out there making sure that the contract is followed and that—mainly, it's quality control. It's the highway department is getting a good product. We measure the work that's done and document the payment as the contractor completes the work.

**12.** Should the parties wish to avoid protracted litigation, settlement might be an attractive method for achieving finality as to this issue in a potentially more economical fashion. Settlement may also be a useful means of resolving the issue

raised during oral argument as to the failure of the state to have submitted a signed endorsement to the National Union policy as part of the record in this case. *See infra*, section D.

**13.** Because all claims that Appellant filed against each defendant other than the Department and Mr. Smith have reached finality through either settlement or dismissal, it appears unlikely that the indemnification agreement would be applied at some future date.

**14.** *See supra* note 13.

provision[15] proscribing an insurer who contracts with the Board of Risk from asserting sovereign immunity as a bar to litigation. *See* 172 W.Va. at 756–57, 310 S.E.2d at 688–89. We were clear in that decision that the bar of sovereign immunity is lifted *only to the extent of the liability insurance procured by the state through the Board of Risk.* Because the indemnification agreement does not stand in the place of an insurance policy issued by an insurer to the Board of Risk for the purpose of protecting the state from damages accruing to it, state funds theoretically remain at risk with regard to claims asserted by Appellant against the Department and Mr. Smith. Therefore, the indemnification agreement is not the "practical equivalent" of insurance for purposes of this Court's decision in *Pittsburgh Elevator.*[16]

### C. Liberty Mutual Policy

As a secondary means of seeking to find coverage under the commercial liability policy issued by Liberty Mutual to NECC, Appellant argues that the Department and Mr. Smith were "additional insureds" under the Liberty Mutual policy based on coverage provided under that policy for an "insured contract."[17] While Appellant looks to this Court's decision in *Marlin* as authority for its position, the parties did not pursue the appropriate procedures for obtaining a . determination of the availability of coverage under the Liberty Mutual policy. In contrast, the plaintiff property-owner in *Marlin*, who sought to be named as an "additional insured" under the general contractor's insurance policies instituted a third-party complaint against the general contractor's liability insurer. 212 W.Va. at 217–18, 569 S.E.2d at 464–65. In finding that the property owner was covered under the contractor's liability policy in *Marlin*, this Court looked to the fact that the construction contract at issue expressly required the property owner to be an "additional insured" on the contractor's liability policy and the insurer had issued a "certificate of insurance" indicating *that the property owner was added to the policy as an additional insured. Id.* at 218, 569 S.E.2d at 465.

In the case *sub judice*, Liberty Mutual was not brought in to the underlying litigation as a third-party defendant.[18] Consequently, there are no appealable rulings on the issue of whether coverage is available to the Department under the Liberty Mutual policy as an "additional insured." *See Marlin*, 212 W.Va. at 225–26, 569 S.E.2d at 472–73.

### D. Unsigned Endorsement

During the oral argument of this matter, Appellant called to our attention[19] the fact that the signature line on Endorsement No. 7 to the National Union policy does not bear the signature of an authorized state repre-

---

15. W.Va.Code § 29–12–5(a)(4) (2004).

16. In addition to the substantive bases that prevent the indemnification agreement from serving as the insurance coverage necessary to sidestep the constitutional bar to suit, there are procedural issues that similarly prevent the agreement from assisting Appellant in her attempt to clear the subject matter jurisdictional hurdle. As the record makes patently clear, no party to this matter ever initiated a declaratory judgment action for the purpose of seeking a ruling on the applicability of the indemnification agreement or the availability of coverage under the Liberty Mutual policy that NECC purportedly relied on for commercial liability purposes. When the Department made a demand of NECC and Balfour Beatty Construction for indemnification under the contract, the demand was rejected based on the fact that the hold harmless language contained in the contract pertained to the negligent actions of the contractor and its agents, but *not* the actions of the Department and its agents. Since Appellant sought recovery against the De-partment and its agents in three counts of the five-count complaint, NECC and Balfour Beatty Construction took the position that the indemnification agreement did not apply to those claims. The record before us does not indicate that either Appellant or the Department took any action to compel a ruling from the trial court on this issue.

17. Counsel for NECC and Balfour Beatty Construction raised due process issues below as to whether the trial court could rule on issues regarding Liberty Mutual since it was not a named party to the litigation.

18. While the Department filed a cross-claim against NECC and Balfour Construction seeking indemnification and/or contribution, the lower court never ruled on this claim after dismissing the case on grounds of sovereign immunity.

19. Although Appellant first raised the issue of the unsigned endorsement in her motion to dismiss, it does not appear that the lower court made a ruling on this issue.

sentative. Following oral argument, Appellant asked this Court to take judicial notice of the fact that there are two recent circuit court rulings from West Virginia trial courts concluding that an unsigned endorsement is not part of an insurance policy. Consequently, an unsigned endorsement cannot operate to modify the terms of coverage as intended by the insurer.

Citing language from *O'Neal v. Pocahontas Transportation Co.*, 99 W.Va. 456, 129 S.E. 478 (1925), the Circuit Court of Marshall County[20] ruled that an unsigned endorsement[21] to an insurance policy issued by National Union Fire Insurance Company was not part of the insurance policy. *See id.* at 465, 129 S.E. at 481. Consequently, Appellant suggests that the language of Endorsement No. 7, which seeks to limit coverage to liability arising from certain types of acts committed by the Department, would not be in effect as a means of excluding coverage were this same reasoning to be applied to this case.

Preferring to allow the lower court to rule upon this issue as an initial matter, we do wish to call this matter to the trial court's attention for purposes of remand. Given both this issue of the unsigned endorsement—a matter that the Department will presumably seek to rectify in prompt fashion in both this case and others[22]—as well as the uncertainty of how the remaining issues will be decided, the parties may wish to pursue a more expeditious means of seeking finality in this case.[23]

Based on the foregoing, the decision of the Circuit Court of Kanawha County is hereby reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

BENJAMIN, Justice, concurring:

(Filed June 23, 2008)

I concur with the majority decision. I write separately because I would remand the decision of the circuit court on somewhat different grounds.

Upon review of this matter, I agree with the circuit court's conclusion that based upon the evidence and deposition testimony presented, no genuine issue of material fact existed with respect to Mr. Smith's conduct as the project supervisor because he did not perform "construction, maintenance, repair or cleaning" on the project site. Rather, Mr. Smith's role in the construction at issue was unquestionably clear, as his duties were specifically relegated to "inspection" of work. Additionally, I agree with the circuit court's conclusion that no genuine issue of material fact existed with respect to Mr. Hardin's conduct as an inspector who reported to Mr. Smith at the construction site because Mr. Hardin specifically testified that his duties were also "quality control" in nature. Indeed, the various examples of conduct provided by the Appellant do in fact reinforce the Appellee's assertion that these men were only inspecting the project to ensure that the contractor uses the correct materials and proceeds according to contract specifications.

In light of the purpose and nature of this type of conduct, I would also hesitate to define the term "inspection" in such a narrow manner as proposed by the Appellant. The majority recognizes, as do I, that the coverage obtained under the National Union policy

---

20. *See Werfele v. Kelly Paving, Inc. et al.*, Consol. Case Nos. 07–C–58M & 05–C–306M, (Cir. Ct. Marshall Co., Jan. 3, 2008); *accord West v. W.Va. Dept. of Transp.*, No. 06–C–61 (Cir. Ct. Brooke Co., Feb. 26, 2008).

21. The endorsement at issue contained the same contractual terms as Endorsement No. 7 in this case.

22. During oral argument, Appellant referenced a statutory provision that requires the countersignature of a licensed resident agent of the insurer on every insurance contract to which the state is a party. *See* W.Va.Code § 33–12–11 (2004) (Repl.Vol.2006). Although the 2004 amendments eliminated the countersignature requirements "for any contract of insurance executed, issued or delivered on or after the thirty-first day of December, two thousand four," the countersignature requirements set forth in that provision were applicable because the insurance contract at issue in this case was executed before the effective date set forth in the amendment.

23. *See supra*, note 12.

is specifically designed for instances when Department employees may be responsible "for an injury by virtue of their presence at the scene and the work they are performing." The work the Department performs for the purpose of inspecting the project is outside the risks sought to be covered by the National Union policy. This is precisely why the Department requires contractors to have their own insurance policy in place to cover any injury attributable to the work performed by the contractor's employees.

Furthermore, with respect to the issues surrounding this case, I must state my serious reservations regarding the constitutionality of this Court's prior decision in *Pittsburgh Elevator v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), with respect to the issue of sovereign immunity. Although that issue was not presented by the parties to this action, if the appropriate case presents itself in the future, I believe this Court should revisit this issue to determine whether it is appropriate to judicially create an exception to sovereign immunity which the West Virginia Constitution explicitly prohibits.

Those issues aside, I concur in the majority's decision to remand the case to provide the circuit court an opportunity to review and rule upon the issue of the unsigned endorsement. That issue, at this juncture, should be developed and ruled upon as an initial matter at the circuit court level.

STARCHER, Justice, concurring:

(Filed July 17, 2008)

I concur with the result reached by the majority opinion. I write separately only to reiterate that our sovereign immunity jurisprudence is based on "archaic constitutional language" that has little relevance in the 21st century. *University of West Virginia Bd. of Trustees ex rel. West Virginia University v. Graf*, 205 W.Va. 118, 125, 516 S.E.2d 741, 748 (1998) (Starcher, J., dissenting).

Sovereign immunity is rooted in English law under "the premise that 'the King can do

no wrong'" and is derived from the monarchy's prerogatives. Erwin Chemerinsky, *Shifting the Balance of Power? The Supreme Court, Federalism, and State Sovereign Immunity: Against Sovereign Immunity*, 53 Stan.L.Rev. 1201, 1202 (2001). The United States fought for its independence against a monarchy in favor of a governmental system that is held accountable for its actions. *Id.* at 1202. The doctrine of "sovereign immunity undermines that basic notion." *Id.* at 1202.

Without accountability, what is to prevent a government from acting outside the law? Sovereign immunity allows a state actor to escape liability where a private actor under the same circumstances would be afforded no such luxury; and for that reason should be eliminated from our jurisprudence.

Instead of directly addressing the constitutional contradictions [1] inherent in the doctrine, this Court has "carved exceptions from the prohibition against suing the State." *Graf*, 205 W.Va. at 122, 516 S.E.2d at 745. Thus, the issue when the State is facing suit is whether its actions fall within one of the many exceptions (for a listing of exceptions *see id.* at 122–23, 516 S.E.2d at 745–46), leading to wholesale and unnecessary confusion in our jurisprudence. *Id.* 205 W.Va. at 124, 516 S.E.2d at 747 (Starcher, J., dissenting).

The exception presented in the majority opinion is:

Suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State.

Syllabus point 2, *Pittsburgh Elevator v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983).

My former colleague, Justice Warren McGraw, noted that "[T]he state actually has a perverse incentive to NOT want insurance coverage when facing a large claim ... [which] runs counter to the goals of risk

---

1. For an in-depth discussion of these contradictions, *see* 53 Stan. L.Rev. at 1210–16; *see also Pittsburgh Elevator Company v. West Virginia Board of Regents*, 172 W.Va. 743, 750–54, 310 S.E.2d 675, 682–87 (1983).

spreading and protection from catastrophic loss...." *Ayersman v. Division of Environmental Protection,* 208 W.Va. 544, 548, 542 S.E.2d 58, 62 (2000) (McGraw, J., concurring).

In the instant case, the Division of Highways ("DOH") argues that because its employee, Mr. Smith, was present in an "inspection" capacity when Mr. Blessing was fatally injured, the National Union policy is not applicable, and the suit is barred by sovereign immunity. The DOH is therefore arguing that it does *not* have insurance coverage—which is contrary to "a normal insured party who wants maximum coverage in an accident...." *Id.* at 548, 542 S.E.2d at 62 (McGraw, J., concurring). Under the DOH's theory, the injured party is afforded absolutely no opportunity to have her case decided on the merits.

"The prospect and actuality of damages can be crucial in creating an incentive for the government to comply with the law." Chemerinsky, 53 Stan.L.Rev. at 1214. Without fear of liability, the State has little incentive to be careful in its actions, because any injuries resulting from a failure to perform its duties are of no financial consequence.

A principal justification for the doctrine of sovereign immunity is said to be the protection of the financial structure of the State. *Pittsburgh Elevator,* 172 W.Va. at 756, 310 S.E.2d at 688. In his article, Professor Chemerinsky addresses this justification. 53 Stan. L.Rev. 1201, 1216–17. (Quoting from *Alden v. Maine,* 527 U.S. 706, 749, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)), he discusses how the United States Supreme Court has viewed the doctrine of sovereign immunity as protecting the State from "being thrust, by federal fiat and against its will, into the *disfavored* status of a debtor, subject to the power of private citizens to levy on its treasury or perhaps even government buildings or property which the State administers on the public's behalf." 53 Stan.L.Rev. at 1217 (emphasis added).

But who among us could ever view being a debtor as a result of one's own negligent acts as "favorable"? When the State through its own negligence has injured an individual, it is precisely the State that is in a better position to spread the costs of the damages it inflicted—rather than a private citizen, who is left with no remedy. As Chemerinsky argues, "[I]t is better to spread the costs of injuries from illegal government actions among the entire citizenry than to make the wronged individual bear the entire loss." *Id.* at 1217.

The issue should be not whether insurance is available, but whether the State breached its duty and caused damages. Yes, taxpayers may feel the impact of damage judgments on the state treasury, and when taxpayers feel that impact, they will demand better behavior by their government. The ultimate result will be greater government accountability.

Still, I concur.