**TEXAS DEPARTMENT OF TRANSPORTATION,**
Appellant

v.

**Zuleima OLIVARES, Individually and as the Representative of the Estate of Pedro Olivares, Jr., and Pedro Olivares, Individually, Appellees.**

No. 14–09–00244–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 15, 2010.

Susan Desmarais Bonnen, Lisa Marie McClain, Austin, for appellant.

Rick Molina, Houston, for appellees.

Panel consists of Chief Justice HEDGES, Justice SEYMORE, and Senior Justice HUDSON.*

## OPINION

CHARLES W. SEYMORE, Justice.

Texas Department of Transportation ("TxDOT") presents this accelerated appeal from the trial court's denial of its plea to the jurisdiction. In its plea, TxDOT challenged the trial court's subject-matter jurisdiction over claims brought by Zuleima Olivares, individually and as representative of the estate of Pedro Olivares, Jr., and Pedro Olivares (collectively, "appellees").

TxDOT argues it is entitled to sovereign immunity relative to all of appellees' claims. In a separate appeal, Fort Bend County Toll Road Authority ("FBCTRA"),

TxDOT's co-defendant in the underlying lawsuit, also challenges the trial court's denial of its plea to the jurisdiction. For reasons outlined below, we affirm in part, reverse and render in part, and reverse and remand in part.

## I. BACKGROUND

On January 1, 2007, Pedro Olivares, Jr. and his wife were traveling westbound on the Westpark Tollway ("Tollway") near Dairy Ashford Road in Harris County when they were struck by a vehicle driven by Michael Ladson. According to appellees, Ladson was traveling on the Tollway in the wrong direction after entering the westbound lanes near Gaston Road in Fort Bend County, approximately eight and one-half miles from the accident scene. Gaston Road intersects with FM 1093, a state road controlled by TxDOT, which merges into the Tollway. Pedro Olivares, Jr. sustained severe bodily injuries resulting in death.

In their second amended petition, appellees assert claims against TxDOT, Fort Bend County, FBCTRA, Harris County, Harris County Toll Road Authority ("HCTRA"), Brown and Gay Engineers, Inc., and Michael Stone Enterprises, Inc. The Estate of Michael Ladson has been designated as a responsible third party. Appellees allege TxDOT is liable for certain premise defects and negligent acts or omissions involving the intersection at FM 1093–Gaston Road and the Tollway. Appellees also contend TxDOT is liable under a joint-enterprise theory.

TxDOT filed a combined plea to the jurisdiction and no-evidence motion for summary judgment, which was later supplemented.[1] Appellees subsequently

---

* Senior Justice J. Harvey Hudson sitting by assignment.

1. The trial court initially granted TxDOT's combined plea and motion, but because appellees were not served with the plea and

amended their petition twice and filed a response to TxDOT's plea. On February 19, 2009, the trial court signed an order denying TxDOT's combined plea and motion. TxDOT now appeals the trial court's denial of its plea to the jurisdiction.

## II. INTERLOCUTORY APPEAL AND STANDARD OF REVIEW

We have statutorily-conferred authority to review the trial court's interlocutory order denying TxDOT's plea to the jurisdiction. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8) (Vernon 2008) (A party may appeal an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit...."). Appellate courts strictly construe statutes authorizing interlocutory appeals. *See State v. Fiesta Mart, Inc.*, 233 S.W.3d 50, 54 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). Subsection 51.014(a)(8) authorizes an appeal only when the trial court grants or denies a plea to the jurisdiction. An appellate court must consider challenges to the trial court's subject-matter jurisdiction on interlocutory appeal, regardless of whether such challenges were presented to or determined by the trial court. *See Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850–51 (Tex.2000).[2]

We review the trial court's ruling on a plea to the jurisdiction *de novo*. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004). In a plea to the jurisdiction, a party may challenge either the pleadings or existence of jurisdictional facts. *Id.* at 226–27; *see also* Rebecca Simmons & Suzette Kinder Patton, *Plea to the Jurisdiction: Defining the Undefined*, 40 St. Mary's L.J. 627, 651–52 (2009).

When a defendant challenges the plaintiff's pleadings, the court's determination turns on whether the pleader has alleged facts sufficient to demonstrate subject-matter jurisdiction. *Miranda*, 133 S.W.3d at 226. To make this determination, courts should glean the pleader's intent and construe the pleadings liberally in favor of jurisdiction. *Id.* If the pleadings do not contain facts sufficient to affirmatively demonstrate the trial court's jurisdiction, but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and plaintiffs should be afforded an opportunity to amend. *Id.* at 226–27. If the pleadings affirmatively negate jurisdiction, a plea may be granted without allowing plaintiffs an opportunity to amend. *Id.* at 227. The opportunity to amend pleadings that are insufficient to establish, but do not

motion, the parties agreed to have the order granting the same vacated and set aside.

2. In previous panel decisions from this court, we expressed that an appellate court does not have jurisdiction on interlocutory appeal to address grounds not asserted in the underlying plea to the jurisdiction. *See Galveston Indep. Sch. Dist. v. Jaco*, 278 S.W.3d 477, 479 n. 2 (Tex.App.-Houston [14th Dist.] 2009), *rev'd on other grounds*, 303 S.W.3d 699 (per curiam); *State v. Clear Channel Outdoor, Inc.*, No. 14–07–00369–CV, 2008 WL 2986392, at *3 (Tex.App.-Houston [14th Dist.] July 31, 2008, no pet.); *Clear Lake City Water Auth. v. Friendswood Dev. Co.*, 256 S.W.3d 735, 747 n. 14 (Tex.App.-Houston [14th Dist.] 2008, pet.

dism'd); *Prairie View A & M Univ. v. Dickens*, 243 S.W.3d 732, 736 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *Brenham Hous. Auth. v. Davies*, 158 S.W.3d 53, 61 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

We are not bound by these opinions because the *Gibson* decision is directly on point. *See Chase Home Fin., L.L.C. v. Cal W. Reconveyance Corp.*, 309 S.W.3d 619, 630 (Tex.App.-Houston [14th Dist.] 2010, no pet. h.) ("[A]bsent a decision from a higher court or this court sitting en banc that is on point and contrary to the prior panel decision ..., this court is bound by the prior holding of another panel of this court.").

affirmatively negate, jurisdiction arises after a court determines the pleadings are insufficient. *White v. Robinson,* 260 S.W.3d 463, 475–76 (Tex.App.-Houston [14th Dist.] 2008, pet. granted) (citing *Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 839–40 (Tex.2007)).

When a defendant challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties. *Miranda,* 133 S.W.3d at 227. We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts arising from such evidence in the nonmovant's favor. *Id.* at 228. If the relevant evidence is undisputed or a fact question is not raised relative to the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* If the evidence creates a fact question regarding the jurisdictional issue, the trial court cannot grant the plea, and the fact issue will be resolved by the fact finder. *Id.* at 227–28.

When resolution of an issue requires interpretation of a statute, we review under a de novo standard. *Mokkala v. Mead,* 178 S.W.3d 66, 70 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). In construing a statute, our objective is to determine and give effect to the legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). If possible, we must ascertain that intent from the language the legislature selected and should not refer to extraneous matters for intent not expressed in the statute. *Id.* If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the words. *St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997).

## III. ANALYSIS

TxDOT contends the trial court lacks jurisdiction over appellees' claims because they cannot demonstrate TxDOT's sovereign immunity has been waived. Disposition of whether immunity has been waived is governed by the Texas Tort Claims Act ("TTCA"). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.001–.109 (Vernon 2005 & Supp. 2009).

### A. Texas Tort Claims Act

Under our common law, sovereign or governmental immunity defeat a trial court's subject-matter jurisdiction. *See Harris County v. Sykes,* 136 S.W.3d 635, 638 (Tex.2004). The TTCA provides a limited waiver of immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem.Code Ann. § 101.021 (Vernon 2005). For premise-defect claims, the governmental unit generally "owes to the claimant only the duty that a private person owes to a licensee," unless the claim involves special defects or "the duty to warn of the absence, condition, or malfunction of [traffic-control devices] as is required by Section 101.060." *Id.* § 101.022(a), (b) (Vernon 2005 & Supp. 2009).

However, there are certain exceptions to waiver of immunity under the TTCA. There is no waiver when a claim arises from

(1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or

(2) a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of

the act to the discretion of the governmental unit.

*Id.* § 101.056 (Vernon 2005). "In other words, the State remains immune from suits arising from its discretionary acts and omissions." *Tex. Dep't of Transp. v. Garza,* 70 S.W.3d 802, 806 (Tex.2002). Similarly, under subsection 101.060(a), the TTCA does not waive immunity as to claims arising from

> (1) the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit;
>
> (2) the absence, condition, or malfunction of a traffic or road sign, signal, or warning device unless the absence, condition, or malfunction is not corrected by the responsible governmental unit within a reasonable time after notice[.]

Tex. Civ. Prac. & Rem.Code Ann. § 101.060(a)(1)(2) (Vernon 2005). "Under subsection (a)(1), the State retains immunity for discretionary sign-placement decisions." *State ex rel. State Dep't of Highways and Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 326–27 (Tex.2002). "Under subsection (a)(2), the State retains immunity as long as it corrects a sign's defective [condition, absence, or malfunction] within a reasonable time after notice." *Id.*

**B. TxDOT's Duties Relative to the Tollway**

 TxDOT first contends that it had no legal duties relative to the Tollway. TxDOT argues that certain evidence,

which was submitted to the trial court in support of other jurisdictional issues, establishes that it did not own or control the Tollway during the relevant period of time.[3] This argument was not raised in TxDOT's plea to the jurisdiction, and, thus, appellees did not present responsive evidence or argument in the trial court. In their brief, appellees neither dispute the evidence referred to by TxDOT nor argue they should be afforded an opportunity to file responsive evidence. Nevertheless, assuming without deciding that TxDOT can stage an evidentiary challenge for the first time on interlocutory appeal, TxDOT's challenge is not meritorious because the referenced evidence does not conclusively negate TxDOT's responsibilities relative to the Tollway.

In its brief, TxDOT explains that the Tollway crosses through Harris County and Fort Bend County. Appellees allege that the accident occurred in the Harris County segment. TxDOT argues it had no duty to maintain, monitor, or operate the Harris County segment, but does not reference any supporting evidence. Therefore, on this record, TxDOT's evidentiary challenge concerning the Harris County segment lacks merit.

As for the Fort Bend County segment, TxDOT refers to its agreement with FBCTRA ("TxDOT–FBCTRA agreement"). The TxDOT–FBCTRA agreement provides that FBCTRA is responsible for maintenance of the main lanes and ramps of the Fort Bend County segment upon completion of the "Project."[4] How-

---

**3.** While this argument could be construed as a defense addressing the merits of the case, we conclude *Miranda* allows this court to examine the issue as a challenge to jurisdiction under sovereign immunity. *See* 133 S.W.3d at 224–25; *Bexar Metro. Water Dist. v. Evans,* No. 04–07–00133–CV, 2007 WL 2481023, at *2 (Tex.App.-San Antonio Sept. 5, 2007, no pet.) (mem. op.) ("Because immuni-

ty from suit and immunity from liability are coextensive under the Texas Tort Claims Act, a governmental unit's plea to the jurisdiction challenging the existence of jurisdictional facts may implicate the merits of the plaintiff's cause of action."); *see also State v. Lueck,* 290 S.W.3d 876, 880–84 (Tex.2009).

**4.** In the TxDOT–FBCTRA agreement, "Project" is defined in relevant part as "construc-

ever, TxDOT did not present any evidence indicating that the "Project" had entered the post-completion stage at the time of the accident.[5] The evidence does not conclusively negate TxDOT's responsibilities relative to the Fort Bend County segment. Accordingly, even if TxDOT may challenge the evidence supporting the duty element of appellees' Tollway-related claims for the first time on interlocutory appeal, its challenge lacks merit on this record. We also conclude that appellees' pleadings are facially sufficient to affirmatively plead TxDOT's duty relative to the Tollway.

## C. Claims Based on Traffic–Control Devices

TxDOT next challenges appellees' claims concerning placement, maintenance, and quality of traffic-control devices at or around the FM 1093–Gaston Road intersection. TxDOT generally argues that these allegations involve exercise of discretion for which immunity is not waived under the TTCA.

## 1. Failure to Install Traffic–Control Devices

▆ TxDOT challenges for the first time on appeal appellees' allegation that it failed to install "non-discretionary" signs and devices after receiving "notice" that such signs and devices were necessary. TxDOT argues these claims are barred because they pertain solely to discretionary acts. TxDOT also challenges appellees' allegations that it designed but failed

to install warning flashers and cameras intended to monitor traffic for safety.

In *City of Grapevine v. Sipes*, the Texas Supreme Court considered whether a city's failure to install a traffic signal, after deciding to do so, fell under the portion of subsection 101.060(a)(2) allowing claims to be brought under the TTCA when the absence of a traffic-control device is not remedied within a reasonable time after notice. 195 S.W.3d 689, 692–95 (Tex.2006). Construing subsection 101.060(a)(2) in light of subsection 101.060(a)(1), the court concluded that timing of implementation is discretionary:

> *When* the City first installs a traffic signal is no less discretionary than *whether* to install it. The timing of implementation could be affected by the governmental unit's balancing of funding priorities, scheduling, traffic patterns, or other matters; to impose liability for the failure to timely implement a discretionary decision could penalize a governmental unit for engaging in prudent planning and paralyze it from making safety-related decisions. This sort of planning and execution is precisely the type of discretionary act for which the TTCA retains immunity. Thus, when subsections (a)(1) and (a)(2) are read together, (a)(2) logically applies only to those traffic signals that have already been installed.

*Id.* at 694. Therefore, TxDOT retained discretion regarding *when* to install the warning flashers. Although section 101.060 applies only to signs, signals, and

---

tion of the interchanges connecting the [Tollway] at FM 1464/FM 1093 and at SH 99...."

5. We recognize that both TxDOT and appellees rely on the "Project Maintenance" section of the TxDOT–FBCTRA agreement as support for their arguments. This section expressly provides, "Upon completion of the project, [TxDOT] and [FBCTRA] agree to the following operation and maintenance respon-

sibilities...." Nevertheless, we refuse to construe appellees' reliance on this section as a deliberate admission that the project was complete at the time of the accident. *See Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996) ("A judicial admission must be a clear, deliberate, and unequivocal statement.").

warning devices, this rationale likewise applies to TxDOT's decision regarding when to install the planned traffic-monitoring cameras because a governmental unit's plans regarding the safety features of a roadway are discretionary. *See State v. San Miguel,* 2 S.W.3d 249, 251 (Tex.1999) (per curiam) (interpreting section 101.056).

In their pleadings, appellees do not specify the reason or reasons *why* TxDOT failed to install these devices. Consequently, appellees' pleadings do not affirmatively demonstrate the trial court's jurisdiction over these claims. However, the allegations under consideration do not affirmatively demonstrate incurable defects in the court's jurisdiction. Specifically, it is unclear whether TxDOT's conduct involved negligent implementation of a discretionary policy decision[6] (e.g., construction workers negligently overlooked that construction plans ordered installation of the devices on a certain date), for which immunity is waived under the TTCA, or a discretionary policy decision (e.g., a decision to postpone installation or the failure to set an installation date), for which immunity is not waived. We also cannot discern whether appellees are alleging that the absence of these items caused a premise defect or simply failed to warn of an existing defect or make it reasonably safe.[7] A plaintiff is entitled to an opportunity to amend if additional facts can overcome the governmental entity's immunity from suit. *See Miranda,* 133 S.W.3d at 226–27; *Koseoglu,* 233 S.W.3d at 840. Accordingly, we reverse the trial court's denial of TxDOT's plea and remand for the trial court to allow appellees a reasonable opportunity to amend their pleadings. *See Miranda,* 133 S.W.3d at 226–27; *see also Koseoglu,* 233 S.W.3d at 839–40.

Finally, appellees' petition does not affirmatively demonstrate the trial court's jurisdiction over their claim that TxDOT failed to install "non-discretionary" signs and devices after receiving notice such signs and devices were necessary. Appellees have not alleged facts and circumstances rendering installation of the signs and devices "non-discretionary."[8] Although we construe pleadings liberally in favor of jurisdiction, we refuse to allow appellees to avoid the general rule that traffic-control device placement is a discretionary governmental function by merely describing the act or omission to be "non-discretionary." Therefore, we reverse the trial court's order relative to this claim and remand for further proceedings after the trial court allows a reasonable opportunity for appellees to amend their pleadings. *See Miranda,* 133 S.W.3d at 226–27; *see also Koseoglu,* 233 S.W.3d at 839–40.

### 2. Traffic–Control Device Deficiencies

---

6. "Negligent implementation" within the context of a claim under the TTCA is discussed in greater depth *infra.*

7. To the extent appellees allege that the lack of traffic-monitoring cameras caused a dangerous condition because there were no people monitoring the roadway, they fail to allege a premise-defect claim under the TTCA. Such a "condition" concerns the activity of people, not the condition of the roadway itself. *See Tex. Parks & Wildlife Dep't v. Garrett Place, Inc.,* 972 S.W.2d 140, 144 (Tex.App.-Dallas 1998, no pet.).

8. To the extent appellees allege the signs were "non-discretionary" because they were required by the Texas Manual on Uniform Traffic Control Devices ("MUTCD"), appellees' allegation that TxDOT "retained the right to supervise and inspect all signs, barricades, and traffic control plans to insure compliance with the [MUTCD]" is not an allegation that TxDOT was required to select and place signs exactly as specified in the MUTCD. Compliance with the MUTCD's provisions is generally not mandatory. *See Brazoria County v. Van Gelder,* 304 S.W.3d 447, 454 (Tex.App.-Houston [14th Dist.] 2009, pet. denied).

TxDOT also contends its immunity is not waived relative to appellees' claims based on certain traffic-control devices that "allow" motorists to travel in the wrong direction. In their petition, appellees allege the Tollway/FM 1093 area near Gaston Road has confusing or misleading signs, signals, and warning devices, inadequate barricades, and insufficient traffic control. As a subset of this claim, appellees allege TxDOT negligently placed warning signs on the wrong side of the road at or near the intersection. Appellees allege these deficiencies constitute negligent implementation of TxDOT's policy to operate FM 1093 and the Tollway safely. Appellees also argue that placement of warning signs on the wrong side of the road resulted in a condition under subsection 101.060(a)(2).

It is well established that a governmental unit is not immune from liability for an injury caused by a premise defect that was created through negligent implementation of policy. *See Mogayzel v. Tex. Dep't of Transp.*, 66 S.W.3d 459, 465–66 (Tex.App.-Fort Worth 2001, pet. denied). A governmental unit's negligence in implementing a formulated policy, such as negligently constructing a designed gabion wall, is not a discretionary function. *See Mitchell v. City of Dallas*, 855 S.W.2d 741, 745 (Tex.App.-Dallas 1993), *aff'd*, 870 S.W.2d 21 (Tex.1994). "[S]overeign immunity is preserved for the negligent discretionary formulation of policy, but not for the negligent implementation of the policy at the [operational/ministerial] level." *Guadalupe–Blanco River Auth. v. Pitonyak*, 84 S.W.3d 326, 342 (Tex.App.Corpus Christi 2002, no pet.). Further, a governmental unit does not relinquish its discretion relative to roadway design by implementing a general policy to operate roads safely. *See Tarrant County Water Control & Improvement Dist. No. 1 v. Crossland*, 781 S.W.2d 427, 433 (Tex.App.-Fort Worth 1989, writ denied) (holding State's alleged policy to "warn of danger" did "not make the State liable for all possible failures to warn. The State may still make specific policy decisions about the design of State projects ...."), *overruled on other grounds by City of Dallas v. Mitchell*, 870 S.W.2d 21, 23 (Tex.1994). In other words, a general policy to build safe roads does not expose a governmental unit to liability for every conceivable safety deficiency under a negligent implementation of policy theory of recovery.

A "condition" under subsection 101.060(a)(2) is defined as "something 'wrong' with the traffic sign or signal such that it would require correction by the State after notice." *Garza*, 70 S.W.3d at 807; *see also Sparkman v. Maxwell*, 519 S.W.2d 852, 858 (Tex.1975) (defining "condition" as "either an intentional or an inadvertent state of being"). The term also "refers to the maintenance of a sign or signal in a condition sufficient to properly perform the function of traffic control for which it is relied upon by the traveling public." *Lawson v. McDonald's Estate*, 524 S.W.2d 351, 356 (Tex.Civ.App.-Waco 1975, writ ref'd n.r.e.). "[I]n the cases in which [the supreme court] has interpreted 'condition' in the context of road signs and signals, [it has] found a waiver of immunity only in those situations in which the sign or signal was either (1) unable to convey the intended traffic control information, or (2) conveyed traffic control information other than what was intended." *Garza*, 70 S.W.3d at 807; *see also Gonzalez*, 82 S.W.3d at 327 ("[S]ubsection [101.060](a)(2) requires the State to maintain traffic signs in a condition sufficient to perform their intended traffic-control function.").

Appellees' contention that confusing and misleading signs, signals, and warning devices, inadequate barricades,

and insufficient traffic control "allow" drivers to enter the Tollway in the wrong direction implicates the adequacy of devices chosen by TxDOT, a discretionary design decision for which immunity is not waived. *See San Miguel,* 2 S.W.3d at 251 ("A court should not second-guess a governmental unit's decision about the type of marker or safety device that is most appropriate."); *Tex. Dep't of Transp. v. Bederka,* 36 S.W.3d 266, 271 (Tex.App.-Beaumont 2001, no pet.) ("Department enjoys immunity from suit regarding its decision to place a particular traffic control signal, even if the signal fails to make the premises safe. The selection of the device employed is not its condition."), *overruled on other grounds by Sipes,* 195 S.W.3d 689.

■ Next, appellees' allegation that warning signs were negligently placed on the wrong side of the road implicates TxDOT's decision relative to the location of the signs, another discretionary decision. *See Gonzalez,* 82 S.W.3d at 326–27 (explaining that State retains immunity for its decision relative to "where" signs should be located); *Johnson v. Tex. Dep't of Transp.,* 905 S.W.2d 394, 398 (Tex.App.-Austin 1995, no writ) (holding that location of where to place sign is a discretionary design decision). Appellees allege "[t]his negligent placement caused a failure to [warn] motorist[s] that they may be going in the wrong direction." They argue that TxDOT failed to maintain the signs "in a condition sufficient to properly perform the function of traffic control for which

[they are] relied upon by the traveling public" because the signs were on the wrong side of the road. *City of Midland v. Sullivan,* 33 S.W.3d 1, 12 (Tex.App.-El Paso 2000, pet. dism'd w.o.j.). Apparently, appellees contend that location of the warning signs was a "condition" of signs under subsection 101.060(a)(2) which prevented or hindered the signs from being seen by motorists.[9]

A "condition" under subsection 101.060(a)(2) has been held to arise when a sign is "unable to convey the intended traffic control information." *Garza,* 70 S.W.3d at 807 (citing *Lorig v. City of Mission,* 629 S.W.2d 699, 701 (Tex.1982) (holding that a "stop sign's obstruction from view by trees or branches is a 'condition' of that sign....")). Appellees, however, allege that the signs failed to warn motorists because of the *location* of the signs. Appellees do not cite any authority supporting their contention that location of a sign as chosen by a governmental entity amounts to a wrongful "condition" of the sign pursuant to subsection 101.060(a)(2), and we decline to so broaden the meaning of "condition." *See Johnson,* 905 S.W.2d at 398 ("If a motorist's claim that a sign is difficult to see were sufficient to call into question ... design discretion, virtually any challenge to the placement of a traffic sign would suffice to preclude summary judgment on sovereign immunity grounds and subject the ... engineering design in this limited area to a jury's review....").[10]

---

9. To the extent appellees allege the signs were placed on the wrong side of the road because their location did not comply with the MUTCD, appellees' allegation that "[TxDOT] retained the right to supervise and inspect all signs, barricades, and traffic control plans to insure compliance with the [MUTCD]" is not an allegation that TxDOT was required to select and place signs exactly as specified in the MUTCD. Compliance with the MUTCD's

provisions is generally not mandatory. *See Van Gelder,* 304 S.W.3d at 454.

10. We note that in *Sparkman,* the supreme court held that a red left-turn arrow which was installed and operated as designed and was intended to direct left-turning motorists to stop presented a condition because it actually directed some motorists to proceed. 519 S.W.2d at 856–58. Therefore, the governmental entity's design decision was held to

"[W]hen traffic engineers decide where to place warning signs around a detour, the State retains its immunity." *Gonzalez,* 82 S.W.3d at 326–27.

We also reject appellees' argument that TxDOT failed to maintain the signs in a condition sufficient to perform their intended function. "[M]aintenance involves preservation of a highway *as it was designed and constructed." Siders v. State,* 970 S.W.2d 189, 193 (Tex.App.-Dallas 1998, pet. denied) (emphasis added). If the signs were located as designed, TxDOT did not fail to maintain the signs by failing to relocate them.

Appellees argue TxDOT did not exercise discretion in installing the subject traffic-control devices because defendant Brown & Gay Engineers, Inc. drafted construction plans for the intersection which TxDOT simply implemented. Appellees do not cite any authority for the proposition that a governmental entity loses its discretion relative to design of a roadway when it constructs the roadway pursuant to an outside engineer's design. In such a situation, the governmental entity necessarily exercises its discretion to approve and adopt the design when it constructs the roadway pursuant to the design. Therefore, appellees' argument is unpersuasive.

Finally, appellees cannot avoid the discretionary-function exception to waiver of immunity by claiming that TxDOT failed to implement its policy to operate a safe road because of the confusing and misleading traffic-control devices; a general safety policy does not vitiate a governmental unit's discretion in roadway design. *See Crossland,* 781 S.W.2d at 433.

Accordingly, appellees' pleadings do not affirmatively demonstrate jurisdiction over these claims. However, the same pleadings do not affirmatively negate the trial court's jurisdiction over these claims; appellees do not specify whether the traffic-control devices were inadequate, or the warning signs were negligently located, because of TxDOT's negligent implementation of the construction plans.[11] Consequently, we reverse the trial court's order denying TxDOT's plea relative to this claim, but remand for further proceedings after the trial court allows appellees a reasonable opportunity to amend their pleadings. *See Miranda,* 133 S.W.3d at 226–27; *see also Koseoglu,* 233 S.W.3d at 839–40.

### 3. Condition of the Pavement Markers

TxDOT next challenges appellees' claim that it failed to maintain pavement markers on FM 1093 and Tollway exits.

Failure to maintain a warning device is a claim pertaining to a "condition" pursuant to subsection 101.060(a)(2). *See Lawson,* 524 S.W.2d at 356. A governmental unit is immune from claims involving the condition of a traffic-control device "unless the . . . condition . . . is not corrected by the responsible governmental

---

present a condition because it conveyed traffic-control information other than intended. In the present case, while appellees allege the signs were "misleading" and "confusing," there are no allegations that the signs conveyed unintended traffic-control information creating a dangerous premises condition. Thus, we decline to apply *Sparkman* to appellees' claim.

**11.** *See City of Lancaster v. Chambers,* 883 S.W.2d 650, 654 (Tex.1994) ("[A]ctions which require obedience to orders . . . are ministerial."); *see also Siders,* 970 S.W.2d at 193 (holding negligent-construction claim regarding a stop sign was merely a disguised design-defect claim because plaintiffs' witnesses admitted road was constructed as designed and plaintiffs agreed the design plans did not specify the removal of the stop sign).

unit within a reasonable time after notice." Tex. Civ. Prac. & Rem.Code Ann. § 101.060(a)(2). In its plea, TxDOT contends appellees can produce no evidence that it had notice of any maintenance defects:

> [Plaintiffs] have not identified, alleged, or evidenced any non-discretionary maintenance defect under the Government's control that caused any actionable damages for which the danger was appreciated by the Government but not by Plaintiffs.

However, in a plea to the jurisdiction, a defendant must produce evidence that the trial court lacks jurisdiction *before* the plaintiff has the burden to present evidence establishing a fact question regarding jurisdiction. *See Miranda*, 133 S.W.3d at 228. Because TxDOT did not present evidence negating its prior knowledge that the pavement markers were in a deficient condition, appellees did not have the burden to present evidence creating a fact question relative to TxDOT's notice.[12] Thus, we affirm the trial court's denial of TxDOT no-evidence challenge regarding its notice of the pavement markers' condition.

Next, TxDOT argues for the first time on appeal that appellees fail to demonstrate how the allegedly dilapidated condition of the pavement markers proximately caused the underlying accident. As noted above, the TTCA provides a limited waiver of immunity for "personal injury and death *so caused* by a condition or use of tangible personal or real property...." 

Tex. Civ. Prac. & Rem.Code Ann. § 101.021 (emphasis added).

Proximate cause includes both cause in fact and foreseeability. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 246 (Tex.2008). Cause in fact requires that the allegedly negligent act or omission constitute "a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* (quoting *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex.2003)). The conduct of a defendant may be too attenuated from the resulting injuries to be a substantial factor in bringing about harm. *Mason,* 143 S.W.3d at 799. Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others. *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002) (quoting *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex. 1987)). In support of its argument, TxDOT relies heavily on *Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339 (Tex.1998).

In *Bossley,* a mental-health patient escaped a treatment facility through unlocked doors, traveled on foot for about half a mile, and attempted to hitchhike along a highway. *Id.* at 340–41. Before he could be apprehended, the patient leaped in front of a moving truck. *Id.* at 341. In holding that the condition of the doors was not a proximate cause of the patient's death, the supreme court explained, "Although [the patient's] escape through the unlocked doors was part of a

---

**12.** TxDOT also contends that appellees' premise-defect claims should be dismissed because TxDOT did not have actual knowledge of any allegedly dangerous condition. TxDOT essentially argues this element is conclusively negated because appellees failed to present evidence creating a fact question as to TxDOT's knowledge. However, in its plea to the jurisdiction, TxDOT argued "there is no evidence TxDOT had actual knowledge of ... a deficiency in available illumination." This argument did not place the burden on appellees to present evidence of TxDOT's knowledge. *See Miranda,* 133 S.W.3d at 228. Accordingly, we overrule TxDOT's contention.

sequence of events that ended in his suicide, the use and condition of the doors were too attenuated from [his] death to be said to have caused it. . . . [His] death was distant geographically, temporally, and causally from the [doors.]" *Id.* at 343. According to the court, "Property does not cause injury if it does no more than furnish the condition that makes the injury possible." *Id.*

*Bossley* is distinguishable from the present case. Appellees allege the pavement markers were in a state of disrepair and drivers were not warned about traveling in the wrong direction. TxDOT argues the casual connection is too tenuous to support jurisdiction because of the eight-mile distance between the deficient pavement markers and the accident site. Because of the close relationship alleged among the deficient markers, Ladson's entering the Tollway in the wrong direction, and the head-on, wrong-way collision, we decline to hold that the distance between the markers and the accident site requires a conclusion of no cause in fact. The condition of the markers was "not so distant geographically, temporally, and causally from the accident as to require a conclusion that legal causation does not exist." *Sullivan*, 33 S.W.3d at 9. "The nexus between the alleged premises [defect] and [injury] in this case is not so highly attenuated that it defies the definition of proximate cause." *Campos v. Nueces County*, 162 S.W.3d 778, 787 (Tex.App.-Corpus Christi 2005, no pet.).

Next, TxDOT references evidence that Ladson was intoxicated and warning signs were in place on the night of the accident. TxDOT argues that it was not "foreseeable that a severely intoxicated person would fail to see a pavement marking (allegedly in a state of disrepair), and the warning signs posted to deter wrong-way entry to the [Tollway], and then travel approxi-

mately eight and a half miles in the wrong direction, ultimately crashing his car into motorists traveling in the proper direction." Assuming without deciding that we may consider this evidentiary argument (not raised in the trial court), such facts do not negate legal causation under the alleged circumstances, but are factors for the trier of fact to consider. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996) ("Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable."); *see also County of Cameron v. Brown*, 80 S.W.3d 549, 556–57 (Tex.2002) ("While [plaintiff's] alleged lack of care may be an issue of comparative responsibility for the jury to decide . . ., it does not render the subsequent harm in this case unforeseeable."). We overrule TxDOT's causation challenge.

■ This conclusion does not end our review of appellees' pavement-markers claim because we are obliged to ascertain the existence of subject-matter jurisdiction. *See Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 358 (Tex.2004), *superseded by statute on other grounds*, Tex. Gov't Code Ann. § 311.034 (Vernon 2005). We identify *sua sponte* a pleading deficiency relative to appellees' claim concerning the condition of the pavement markers.

■ Appellees allege the "pavement markers were in a condition to insufficiently perform their traffic control function. . . ." As such, the claim concerns the condition of a traffic-safety device and, thus, falls under the provisions of subsection 101.060(a)(2). Tex. Civ. Prac. & Rem. Code Ann. § 101.060(a)(2); *see also Sullivan*, 33 S.W.3d at 11 (explaining that complaint regarding condition of pavement markers falls under subsection 101.060(a)(2)). To affirmatively demonstrate the trial court's jurisdiction, appel-

lees must allege "the condition of [the pavement markers] [was] not corrected by the responsible governmental unit within a reasonable time after notice[.]" Tex. Civ. Prac. & Rem.Code Ann. § 101.060(a)(2). This notice can be either actual or constructive. *See City of Austin v. Lamas,* 160 S.W.3d 97, 101–03 (Tex.App.-Austin 2004, no pet.); *Robnett v. City of Big Spring,* 26 S.W.3d 535, 538 (Tex.App.-Eastland 2000, no pet.). Such an allegation is absent from appellees' pleadings. Accordingly, we remand for further proceedings after the trial court allows appellees a reasonable opportunity to amend their pleadings pertaining to the condition of pavement markers. *See Miranda,* 133 S.W.3d at 226–27; *see also Koseoglu,* 233 S.W.3d at 839–40.

**D. Negligent Implementation of Policy to Operate Tollway Safely**

 We next consider TxDOT's challenge to appellees' negligent-implementation claims relative to the Tollway. As stated *supra,* a governmental unit is not immune from suit for negligent implementation of policy, such as negligent construction or maintenance. *See Mitchell,* 855 S.W.2d at 745.

Appellees allege all defendants agreed "to manage, regulate, oversee, construct, maintain, and operate ... the [T]ollway safely," and "formulated a policy to monitor the [T]ollway entrances and exits to prevent wrong-way traffic and unauthorized vehicles on the [T]ollway." According to appellees, this policy was negligently implemented because the Tollway was constructed with minimal road shoulders and without traditional tollbooths and toll plazas from which wrong-way drivers could be detected by law-enforcement personnel and other persons.

We once again note that TxDOT's discretion for roadway design was not limited by any general policy to operate the Tollway safely. *See Crossland,* 781 S.W.2d at 433. Appellees also specifically allege that TxDOT made a policy decision to monitor all Tollway entrances for wrong-way drivers. Nevertheless, TxDOT had discretion in choosing how to monitor the Tollway, and it is unclear whether appellees are alleging that the absence of traditional toll booths and toll plazas caused a premise defect or simply failed to warn of an existing defect or make it reasonably safe.[13] It is also unclear whether the failure to construct wider road shoulders resulted from discretionary formulation of policy or negligent implementation of policy. *See Siders,* 970 S.W.2d at 193 (emphasizing that negligent implementation claim fails because road was constructed as designed). Accordingly, we remand for the trial court to allow appellees a reasonable opportunity to amend their pleadings. *See Miranda,* 133 S.W.3d at 226–27; *see also Koseoglu,* 233 S.W.3d at 839–40.[14]

13. To the extent appellees allege that the lack of toll booths and toll plazas caused a dangerous condition because there were no people monitoring the roadway, they fail to allege a premise defect claim under the TTCA. Such a "condition" concerns the activity of people, not the condition of the roadway itself. *See Garrett Place,* 972 S.W.2d at 144.

14. TxDOT also challenges appellees' claims that TxDOT was negligent in monitoring and operating the Tollway, arguing such claims do not pertain to a condition or use of property as required by section 101.021. *See* Tex. Civ. Prac. & Rem.Code § 101.021(2). However, construing appellees' pleadings in favor of jurisdiction, the factual basis for these claims is the lack of traditional toll booths and toll plazas on the Tollway. We cannot discern whether such items were required to be implemented or whether appellees contend the absence of such items caused a premise defect or simply failed to warn of or make safe an existing premise defect. Thus, we remand for an opportunity to amend.

### E. Joint Enterprise

█ Finally, we consider TxDOT's contentions regarding appellees' joint-enterprise theory of liability.

█ An essential element of joint enterprise is an agreement, express or implied, among the group members. *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 222 (Tex.App.-Houston [14th Dist.] 2008, no pet.). Joint enterprise is not an independent basis for waiver of immunity, but may result in waiver of immunity under the TTCA where a governmental entity would be liable for another's negligence if the governmental entity were a private person. *Id.* at 218–19 (quoting *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex.2000)).

Appellees allege that TxDOT, FBCTRA, HCTRA, Fort Bend County, Harris County, and Michael Stone Enterprises "had an express or implied agreement to [construct,] develop, operate, and maintain the Westpark Tollway." In its argument, TxDOT asserts that the only two agreements at issue are the TxDOT–FBCTRA agreement and an agreement between Harris County and Fort Bend County ("Counties' agreement"). However, nothing in the record supports that no other agreements existed.

As an initial matter, TxDOT asserts that it is not a party to the Counties' agreement. We agree and hold that the Counties' agreement does not support a claim of joint-enterprise liability against TxDOT.

TxDOT also argues that the Local Government Code precludes a party from claiming that a contract TxDOT executed with FBCTRA supports a claim of joint-enterprise liability. *See* Tex. Loc. Gov. Code Ann. § 271.160 (Vernon 2005). We agree for the reasons stated in today's opinion in the companion case, *Fort Bend County Toll Road Authority v. Olivares*,

316 S.W.3d 114 (Tex.App.-Houston [14 Dist.] 2010). Accordingly, we hold appellees are not entitled to pursue a cause of action under a joint-enterprise theory of liability between TxDOT and FBCTRA.

Nonetheless, we cannot dismiss appellees' joint-enterprise theory of liability against TxDOT in its entirety because TxDOT presented no affidavits or other evidence negating its participation in any other express or implied agreements. Therefore, TxDOT has not conclusively negated appellees' allegation that express or implied agreements existed between TxDOT and HCTRA, Fort Bend County, Harris County, and Michael Stone Enterprises. *See City of Austin v. Leggett*, 257 S.W.3d 456, 462 (Tex.App.-Austin 2008, pet. denied) ("Unless a pled jurisdictional fact is challenged and conclusively negated . . ., it must be taken as true for purposes of determining subject-matter jurisdiction.").

Accordingly, we reverse the trial court's denial of TxDOT's plea relative to appellees' claim of joint-enterprise liability between TxDOT and FBCTRA and render judgment dismissing this claim. However, we affirm the trial court's denial of TxDOT's plea relative to appellees' claim of joint-enterprise liability between TxDOT and HCTRA, Fort Bend County, Harris County, and Michael Stone Enterprises.

### IV. CONCLUSION

We affirm the trial court's order denying that portion of TxDOT's plea challenging appellees' claim of joint-enterprise liability between TxDOT and HCTRA, Fort Bend County, Harris County, and Michael Stone Enterprises. We reverse the trial court's order and render judgment dismissing for want of jurisdiction appellees' claim of joint-enterprise liability between TxDOT and FBCTRA.

Finally, we reverse the trial court's order denying TxDOT's plea and remand for further proceedings after the trial court allows appellees a reasonable opportunity to amend their pleadings relative to the following claims:

- Premise defect resulting from failing to install warning flashers, cameras, and non-discretionary signs;
- Premise defect resulting from inadequate barricades, insufficient traffic control, and signs placed on the wrong side of the road;
- Premise defect resulting from deficient condition of pavement markers; and
- Premise defect for constructing the Tollway with minimal shoulders and without traditional tollbooths and toll plazas.

HUDSON, J., dissenting.

J. HARVEY HUDSON, Senior Justice, dissenting.

Because the Texas Department of Transportation enjoys sovereign immunity and, in my view, has not waived such immunity, I must dissent.

From the pleadings, briefs, and oral arguments it appears there is general agreement among the parties as to the factual background leading to the plaintiffs' loss. In the early morning hours of January 1, 2007, a severely intoxicated Michael Ladson was observed by startled motorists driving the wrong way in the westbound lanes of a divided highway, namely, the Westpark Tollway.[1] From eyewitness accounts and 911 telephone calls, it appears Ladson continued driving against the traffic for approximately eight and one half miles until he fatally crashed head-on into the appellees' vehicle. How and where

Ladson entered the westbound lanes of traffic is not known. However, based on Ladson's location at the time the initial reports of his erratic behavior were received, the closest possible point of entry was the Gaston Road intersection. If Ladson entered the freeway from Gaston Road, he most likely was driving southbound on Gaston when it intersected and terminated at an access road. Contrary to signage, Ladson then turned left, driving eastbound on a westbound access road. Contrary to signage, Ladson continued east on the access road until, contrary to traffic reflectors, he entered the exit ramp of the freeway. Ladson then proceeded another eight and one half miles against oncoming traffic until the fatal crash.

Despite the fact that Ladson was committing a criminal act when the crash occurred, appellees contend the Texas Department of Transportation ("the department") is liable for their damages because the department could have done more to prevent Ladson from entering the tollway by relocating certain signage, adding traffic lights, etc. It is hard to imagine, however, a greater indication of error than eight and one half miles of opposing headlights on a divided highway.

The only reason I can discern for the department's inclusion in this litigation is its "deep pockets," and there are no pockets deeper than the public treasury which can be resupplied by seemingly endless amounts of tax-payer dollars. Accordingly, this case illustrates both the wisdom and necessity of sovereign immunity.

THE DOCTRINE OF SOVEREIGN IMMUNITY

In recent years the doctrine of sovereign immunity has fallen into disfavor.[2] It has

---

1. Ladson's blood alcohol was three times the legal limit.

2. *Principe Compania Naviera, S.A. v. Bd. of Comm'rs of Port of New Orleans*, 333 F.Supp. 353, 355 (E.D.La.1971).

been characterized as "archaic,"[3] "feudal,"[4] "primitive,"[5] "absurd,"[6] "a legal fiction,"[7] and contrary to the public interest.[8] At least one jurist has judged the doctrine to have "little relevance in the 21st century."[9]

### The King Can Do No Wrong

Ancient though the doctrine may be, it is neither primitive nor contrary to public interest. Although Blackstone has been pilloried for justifying sovereign immunity on the "outmoded"[10] medieval precept that "the King can do no wrong,"[11] critics rarely grasp his meaning.[12] Professor Louis Jaffe and many other scholars are of the opinion that the expression "the King can do no wrong" originally meant precisely the opposite of how it is interpreted today.[13] Blackstone plainly states that the "ancient and fundamental maxim is not to be understood, as if everything transacted by the government was of course just and lawful."[14] When Blackstone spoke of "the king," he spoke of the regal office, not an individual. Thus, the "king never dies,"[15] he "is always present in all his courts,"[16] and he "is incapable of doing wrong."[17] In other words, as Professor Jaffe suggests, the king must not, was not allowed, and was not entitled to do wrong.

As a proponent of natural law, Blackstone regarded "the Law" as emanating from God, not government. Thus, "the principal duty of the king is, to govern his people according to law."[18] Citing Henry de Bracton, Blackstone observed, the king "ought not to be subject to man, but to God, and to the law, for the law maketh the king."[19] Stated slightly differently,

3. *Granite Valley Hotel Ltd. P'ship v. Jackpot Junction Bingo & Casino*, 559 N.W.2d 135, 162 (Minn.Ct.App.1997) (Randall, J., concurring).

4. *Nevada v. Hall*, 440 U.S. 410, 415, 99 S.Ct. 1182, 1185, 59 L.Ed.2d 416 (1979).

5. *City of Danville v. Smallwood*, 347 S.W.2d 516, 518 (Ky.1961).

6. *Haynes v. Franklin*, 95 Ohio St.3d 344, 2002–Ohio–2334, 767 N.E.2d 1146, at ¶ 31 (Pfiefer, J., dissenting).

7. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 848 (Tenn.2008).

8. *State ex rel. Hanosh v. State ex rel. King*, 2009–NMSC–047, ¶ 11, 147 N.M. 87, 217 P.3d 100.

9. *Blessing v. Nat'l Eng'g & Contracting Co.*, 222 W.Va. 267, 664 S.E.2d 152, 160 (2008) (Benjamin, J., concurring).

10. *Dairyland Ins. Co. v. Bd. of County Comm'rs of Bernalillo County*, 88 N.M. 180, 181, 538 P.2d 1202, 1203 (N.M.Ct.App.1975).

11. 3 William Blackstone, Commentaries 254.

12. It is the habit of men, like their canine companions, to "always bark at those they know not, and ... it is their nature to accompany one another in those clamors." Sir Walter Raleigh, *Preface to the History of the World*, in The Harvard Classics 67 (Charles W. Eliot. ed., 1969).

13. Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L.Rev. 1, 4 (1963). This evolution of contradictory meanings is best described by Justice Frankfurter, "A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas." *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 68, 63 S.Ct. 444, 452, 87 L.Ed. 610 (1943) (Frankfurter, J., dissenting).

14. 1 Blackstone, Commentaries 238–39.

15. *Id.* at 242.

16. *Id.* at 260.

17. *Id.* at 239.

18. *Id.* at 226.

19. *Id.* at 227.

"the king also hath a superior, namely God, and also the law, by which he was made a king." [20] Thus, the unjust actions and edicts of a corrupt king, being not from God, were not law. Accordingly, a corrupt king could be defied, resisted, and even overthrown precisely because "the king can do no wrong." [21]

Oliver Wendell Holmes, who rejected Blackstone's concept of natural law, nevertheless agreed with Blackstone's maxim, but for a very different reason. As a legal positivist, Holmes believed law was "posited" not by a mythical god, but by the highest sovereign in existence—the state. Holmes held that a "sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." *Kawananakoa v. Polyblank*, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907). Accordingly, in Holmes' view, the law is neither eternal nor immutable; men have no inherent or inalienable rights; and "the king can do no wrong" because, by virtue of his political and military power, the king is sovereign and, thus, has the prerogative to define right and wrong until such time as he is supplanted by one stronger than himself.

Notwithstanding their opposing world views (natural law versus legal positivism), both Holmes and Blackstone recognized the practical limitations of suing the sovereign for there is no higher authority before whom one can prosecute an appeal. Further, it is of no consequence that we live under a republic rather than a monarchy. No writ or appeal, for example, may be brought against the United States Supreme Court. While that tribunal undoubtedly errs (and some believe quite frequently), yet there is no higher tribunal to which one can appeal. Thus, the Supreme Court enjoys, in a very real sense, sovereign immunity.

Moreover, even when a sovereign "waives" its immunity, as Texas has done to a limited degree under the Texas Tort Claims Act, the waiver is largely illusory. The courts of this state are no less the "State of Texas" (i.e., the sovereign) than is the governor or legislature. Thus, in reality, there is no higher authority before which the aggrieved citizen can bring his appeal. In this sense, the state must, of logical necessity, remain immune.

**20.** *Id.*

**21.** I recognize that some have concluded the doctrine of sovereign immunity is obsolete because it "was rejected by the colonists when they declared their independence from the Crown." *See Hall*, 440 U.S. at 415, 99 S.Ct. at 1185. Nothing could be further from the truth.

The Declaration of Independence is an articulate justification and defense for revolution under principles of natural law. Jefferson argues that it is "the laws of nature and of nature's God" that entitled the colonists to ignore the edicts of the king. As Blackstone stated:

This law of nature, being co-eval with mankind and dictated by God himself, is of course superior in obligation to any other. It is binding over all the globe, in all countries, and at all times: *no human laws are of any validity, if contrary to this;* and such of them as are valid derive all their force, and all their authority, mediately or immediately, from this original. 1 Blackstone, Commentaries 41 (emphasis added). Thus, when a king oppresses his subjects contrary to the just principles of natural law, Blackstone argues he is deemed to have *abdicated the throne* because the king can do no wrong. *Id.* at 238.

Nothing in our Declaration of Independence repudiates the doctrine of sovereign immunity.

### Actions Against the Sovereign

Originally, when a person suffered injury or death at the hands of another, he or his kin had a right of "private war" against the offender.[22] These wars, however, had a tendency to escalate.

> The injured kin would avenge its wrong not merely on the person of the slayer, but on his belongings. It would have life or lives for life, for all lives were not of equal value; six ceorls must perish to balance the life of one thegn.[23]

Thus, the blood-feud was both common and immensely destructive. "Private war" damaged the peace of the king's realm. An orderly, productive society was impossible while such conflicts raged. However, in time, it was discovered an offender could sometimes buy off the kin of his victim. Money, every now and then, soothes and satisfies the passion for revenge.

To preserve the peace, the kings of England, as well as other Germanic tribes, encouraged a system of pecuniary compositions.

> The offender could buy back the peace that he had broken. To do this he had to settle not only with the injured person but also with the king: he must make *büt* to the injured and pay a *wite* to the king.... Gradually more and more offenses became emendable.[24]

Thus, the blood-feud could be prosecuted only if the offender failed to pay the *büt* (for injuries) or the *wer* (for homicide). In other words, "the compensation recovered in the appeal was the alternative of vengeance."[25]

Even unintended injuries were compensable under concepts of vengeance. Thus, if a man was gored by his neighbor's ox, he was entitled to take vengeance against the ox.[26] The owner of the ox was liable only to the extent of his ownership in the offending chattel; thus, he was obliged to either surrender the ox or compensate the injured man and thereby retain his interest in the ox. Even inanimate objects that caused injury or damage were subject to vengeance. As Holmes observed, we see this demonstrated when a civilized man kicks a door that pinches his finger.[27] Thus, the common law action of trespass (seeking compensation for personal or property damages whether intentionally or negligently inflicted) arose directly out of the criminal law.[28] Moreover, all personal actions in civil law have subsequently grown out of trespass.[29]

Viewed in this light, actions against the sovereign seem exceptionally inapt. Such suits have no power to punish or deter as they would if brought against an individual because the state pays with another's money, not its own. No vengeance is achieved; no retribution is meted out. Moreover, a fundamental concept of our government is that the people are sovereign and possess all of the powers of sovereignty. *Byers v. Patterson*, 219 S.W.3d 514, 521 (Tex.App.-Tyler 2007, no pet.). Thus, an action

---

**22.** *See* Hugo Grotius, *On the Law of War and Peace* 34–35 (Kessinger 2004).

**23.** 2 Sir Frederick Pollock & Frederic William Maitland, *The History of English Law* 450 (2d ed. Cambridge 1899).

**24.** *Id.* at 451.

**25.** O.W. Holmes, Jr., *The Common Law* 2–3 (1881).

**26.** *Id.* at 7–10.

**27.** *Id.* at 11.

**28.** F.W. Maitland, *The Forms of Action at Common Law* 48–49 (Cambridge 1948).

**29.** *Id.* at 65.

against the sovereign "is in effect suing oneself, which is a legalistic anomaly." *Ace Flying Serv., Inc. v. Colo. Dep't of Agric.*, 136 Colo. 19, 24, 314 P.2d 278, 281 (1957). Since sovereignty rests in the people collectively, one person has no authority to elevate his will over the will of the many. This is not to say that an individual can never be compensated for wrongful injury negligently inflicted by the sovereign or its agents, for even in Blackstone's day there was recompense.

Despite the fact that the king could do no wrong and was absolutely immune from suit, an individual who suffered injury inflicted by the crown could seek redress from the king by numerous writs and common law actions.[30] One may wonder then in what manner the king was immune from suit. Blackstone continues:

> And, first, as to private injuries; if any person has, in point of property, a just demand upon the king, he must petition him in his court of chancery, where his chancellor will administer right as a matter of grace, though not upon compulsion. And this is entirely consonant to what is laid down by the writers on natural law. "A subject, says Puffendorf, so long as he continues a subject, hath no way to *oblige* his prince to give him his due, when he refuses it; though no wise prince will ever refuse to stand to a lawful contract. And, if the prince gives the subject leave to enter an action against him, upon such contract, in his own courts, the action itself proceeds rather upon natural equity, than upon the municipal laws." For the end of such action is not to *compel* the prince to observe the contract, but to *persuade* him.[31]

Likewise, in a democratic republic, a person allegedly suffering injury due to state action or negligence cannot bring suit without the consent of the sovereign, i.e., the people. Further, the people do not speak through the written opinions of their judges, nor are we endowed with some "divine right" to unilaterally open the coffers of state government. The people speak through their constitution and legislative enactments. Thus, we must look to what extent and under what circumstances the people have consented to be sued.

### TEXAS TORT CLAIMS ACT

Apart from specific legislative action in individual cases, sovereign immunity has been partially waived by the Texas Tort Claims Act. Tex. Civ. Prac. & Rem.Code Ann. § 101.025 (Vernon 2005). The tort claims act waives sovereign immunity for death caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law. *Id.* § 101.021(2) (Vernon 2005). But, sovereign immunity is expressly reserved in claims arising from the failure of a governmental unit *initially* to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit. *Id.* § 101.060(a)(1) (Vernon 2005). However, once a sign or signal is installed, "the absence, condition, or malfunction of a traffic or road sign, signal, or warning device [is actionable] unless the absence, condition, or malfunction is not corrected by the responsible governmental unit within a reasonable time after notice." *Id.* § 101.060(a)(2) (Vernon 2005).[32]

---

**30.** 3 Blackstone, Commentaries 254–69.

**31.** 1 Blackstone, Commentaries 236.

**32.** While it is the legislature's prerogative to do so, it appears the statute is contrary to public interest in that it encourages the state to install no traffic signs, warning lights or

### Quality and Sufficiency of the Traffic Control Devices

The appellees first contend the department was negligent in that it failed to install sufficient signs, lights, and traffic control devices to prevent Ladson from improperly entering the tollway. The majority correctly surmises that all decisions regarding whether, when and why traffic control devices should be installed are discretionary decisions protected by sovereign immunity. However, the majority remands this cause to allow appellees to amend their pleadings, if possible, to allege "non-discretionary" acts by the department that resulted in injury and, thus, are not protected by sovereign immunity.

The majority does not suggest, and I cannot fathom, what "non-discretionary" acts are involved in deciding if, how, and when to install traffic signs and signals. Thus, no purpose is gained by a remand other than needlessly prolonging the litigation. Accordingly, I dissent to the remand.

### Negligent Implementation

Appellees also charge the department negligently implemented its decision to install traffic signs and devices by failing to place them in the most advantageous positions. The majority concludes the placement of traffic control signs and devices is protected by sovereign immunity, but again remands this cause to permit appellees to amend their pleadings to allege "whether the traffic-control devices were inadequate, or the warning signs were negligently located, because of TxDOT's negligent implementation of the construction plans."

The precise placement of traffic signs and control devices to achieve maximum impact and advantage is subject to reasonable disagreement. Without sovereign immunity, every accident would be followed by a suit contending the traffic sign should have been positioned "a few inches higher" or "a couple of feet to the left." These are matters clearly left to the discretion of the department and its engineers in the field. Furthermore, there is not the slightest suggestion of negligent implementation of construction plans in the record and pleadings before us. Accordingly, I dissent to the remand.

### Maintenance

Appellees contend some of the traffic buttons on the access road and exit ramp were chipped and damaged. These buttons possess white and red reflectors. When a driver is proceeding in the proper direction, the white reflectors delineate the lanes of traffic. When a driver is going in the wrong direction, he is confronted with red warning reflectors. Appellees suggest that some of these reflectors were damaged and/or missing, and, thus, were not properly maintained. The tort claims act waives sovereign immunity where the defective "condition . . . is not corrected by the responsible governmental unit within a reasonable time after notice." Tex. Civ. Prac. & Rem.Code Ann. § 101.060(a)(2). The department asserts appellees have failed to allege or show it had any notice of the alleged defect. The majority rejects the department's position because it had the burden of establishing sovereign immunity. Relying on *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004), the majority contends the department was required to assert and sup-

control devices. So long as the state takes no action to protect the public, it is immune from suit. However, if the state installs a traffic sign or control device and fails to keep it properly maintained, it is subject to liability. Thus, the state installs traffic safety devices at its peril.

port with evidence its assertion that it had no notice of the alleged defect. Thus, the majority affirms the trial court's denial of the department's plea to the jurisdiction on this issue.[33]

Millions of traffic buttons have been installed on Texas highways. If liability can be imputed to the state because some buttons have since been chipped or broken, it would have been better for the state (not the travelling public) if they had never been installed. Whether the traffic buttons on the access road at issue were in need of maintenance has not been established. Here, the department alleged in its plea to the jurisdiction that if the traffic buttons were in need of repair (which it did not concede), the appellees failed to allege or show it had knowledge of the danger. Indeed, one has to wonder how many times department employees are assigned to drive the wrong way at night on a one-way street to test the efficacy of the traffic buttons. Moreover, even a sober citizen who found himself driving the wrong way on a one-way street would not likely make a "button" report to the department. Here, the department did all it could do; it raised the issue before the trial court.

By holding the department was required to prove the non-existence of an event, the majority stands *Miranda* on its head. In *Miranda,* the court sought to protect "the interests of the state *and* ... injured claimants." *Miranda,* 133 S.W.3d at 228 (emphasis added). Here, the majority asks the state to prove a negative or waive its sovereign immunity. If the plaintiffs possess evidence that the department was notified prior to the accident that the traffic buttons were in disrepair, it is not unreasonable to expect them to allege and prove such facts. Accordingly, I dissent.

### *Negligent Implementation of Tollway Policy*

Appellees contend the department negligently failed to implement its policy to safely operate the tollway when it did not erect traditional toll booths and wider road shoulders. Appellees argue that if traditional toll booths had been erected on the exit ramps, Ladson might not have been able to enter the westbound lanes. The majority remands this claim to permit the appellees to amend their pleadings, if possible, to allege that the failure to build toll booths and wider road shoulders constituted a negligent implementation of construction plans.

The Texas Tort Claims Act does not waive sovereign immunity for roadway design. *Tex. Dep't of Transp. v. Ramirez,* 74 S.W.3d 864, 867 (Tex.2002). The decision to install or not install traditional toll booths or wider shoulders was a matter of roadway design. Moreover, there is not the slightest suggestion of negligent implementation of construction plans in the record and pleadings before us. Accordingly, I dissent to the remand of this issue.

### *Joint Enterprise*

Finally, appellees assert the department is liable under a "joint enterprise" theory. Under Texas law a joint enterprise, as that term is used in the law of negligence, signifies a legal relationship between two or more parties that imposes the responsibility upon each joint venturer for the negligent acts of the other while acting in furtherance of their common undertaking. *Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.,* 28 S.W.3d 64, 67 (Tex.App.Tex-

---

**33.** The majority ultimately determines that appellees failed to allege a required element of their claim concerning traffic buttons and remands for a reasonable opportunity to remedy such deficiency.

arkana 2000, no pet.). Thus, appellees argue that by virtue of a joint enterprise agreement among the department, the Fort Bend County Toll Road Authority, the Harris County Toll Road Authority, Fort Bend County, Harris County, and Michael Stone Enterprises, the department is liable for the negligent conduct of any and all members of the enterprise.

For its part, in its plea to the jurisdiction, the department submitted two agreements: (1) a contract between Harris County and Fort Bend County; and (2) a contract between the department and the Fort Bend County Toll Road Authority. These agreements simply provide for the construction of the roadway; they make no provision for revenue sharing or the operation of the toll road. However, to establish a joint enterprise, the plaintiff must show: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) *a community of pecuniary interest in that purpose, among the members;* and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000) (emphasis added).

The majority nevertheless holds the department "has not *conclusively* negated" appellees' allegation that other express or implied agreements existed. (Emphasis added). Thus, the majority affirms the trial court's denial of the department's plea to the jurisdiction on this issue.[34]

Once again, I am perplexed as to how the department might go about proving the non-existence of alleged contracts. In my view, the department did all it could to raise, sharpen, and clarify the issue. *It denied the existence of any agreements save two which it submitted to the trial court.* What more could it have done? If appellees are aware of any additional agreements, it was incumbent upon them to offer the documents or evidence in rebuttal.

For these reasons, I concur with the majority's dismissal of appellees' joint enterprise theory of liability against Fort Bend County Toll Road Authority and respectfully dissent to all other aspects of the decision.

---

**34.** The majority here and in the companion case, *Fort Bend County Toll Road Authority v. Zuleima Olivares, et al.,* 316 S.W.3d 114, (Tex.App.Houston [14th Dist.] 2010), concludes that statute bars joint enterprise liability against the Fort Bend County Toll Road Authority. Thus, the majority dismisses appellees' joint enterprise theory of liability against the authority for want of jurisdiction. I concur in this result.